**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE ENGAGESMART, INC. SECURITIES LITIGATION | Case No. 24-cv-1083-RGA<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>**FILED UNDER SEAL** |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

INTRODUCTION .......... 5

PARTIES .......... 13

A. Plaintiffs .......... 13

B. Defendants .......... 14

1. Defendant EngageSmart .......... 14

2. The Special Committee Defendants .......... 14

3. The Board Defendants .......... 15

4. The Officer Defendants .......... 16

5. Defendant General Atlantic .......... 17

6. Defendant Vista .......... 18

I. FACTUAL BACKGROUND .......... 18

A. General Atlantic's Ownership and Governance Rights Over EngageSmart .......... 18

B. Following EngageSmart's IPO, General Atlantic Attempts to Liquidate a Portion of Its Investment .......... 21

C. EngageSmart Sets Up a Conflicted Special Committee, But Vista Backs Away .......... 24

D. General Atlantic Continues Its Pursuit of Liquidity .......... 27

E. General Atlantic and Goldman Restart the Sales Process with an Understanding That Maximizing the Purchase Price Is Not in General Atlantic's Best Interests .......... 28

F. EngageSmart Retains Conflicted Goldman and Reconstitutes the Conflicted Special Committee, Which Retains Conflicted Evercore .......... 31

G. The Special Committee "Approves" the Script and Buyer List that Severely Limited the Potential Bidders .......... 34

H. Despite Conducting Outreach Exclusively for Minority Investments, General Atlantic and EngageSmart Privately Inform Vista That It Would Consider a Majority Investment .......... 36

I. Goldman and General Atlantic Purposely Keep the Special Committee and Evercore in the Dark .......... 37

J. Evercore Again Pushes to Explore A Majority Sale, But General Atlantic Refuses ..... 39

K. Bid Day Comes and Vista Gets More Inside Information ..... 41

L. Francisco Partners "Prefers" A Majority Deal and Complains About the Lack of Diligence ..... 42

M. Vista Follows Its Well-Known and Anticipated High-Pressure Acquisition Strategy ..... 43

N. Evercore Is Excluded From Communications While Vista Capitalizes On Its Inside Information and Makes A Majority Deal Proposal ..... 45

O. Vista's Bid is Accepted in Just Three Days Despite the Fact That Other Bidders Were Not Given the Chance to Compete for a Majority Position ..... 47

P. After the Go-Shop Fails, Defendants File a Materially Misleading Proxy Statement, and the Merger Is Approved ..... 51

II. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ..... 53

A. False or Misleading Statements or Omissions of Material Facts in the October 2023 Merger Press Release ..... 53

B. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Definitive Proxy ..... 57

1. False and Misleading Statements or Omissions of Material Facts Concerning the Fairness of The Merger Process ..... 57

2. False and Misleading Statements or Omissions of Material Facts Concerning Alternative Bidders ..... 60

3. False and Misleading Statements or Omissions of Material Facts Concerning General Atlantic's Desire for Liquidity as a Motivating Factor ..... 63

4. False and Misleading Statements or Omissions of Material Facts Concerning Goldman's Conflicts ..... 64

5. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee's Independence ..... 66

C. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Schedule 13E-3 by EngageSmart, General Atlantic, and Vista ..... 68

III. ADDITIONAL ALLEGATIONS OF SCIENTER ..... 68

A. General Atlantic Was Motivated to Keep the Merger Price Low ........................ 68

B. General Atlantic and Summit's Needs for Liquidity Knowingly Impacted Deal Negotiations and Provided a Motive to Accept a Suboptimal Deal While Keeping Unaffiliated Stockholders in the Dark ........................................ 69

C. General Atlantic's Rollover of Equity, Which Violated EngageSmart's Certificate of Incorporation, Was Extremely Valuable ........................................ 71

D. General Atlantic, EngageSmart, and the Special Committee Knew the Special Committee Did Not Control the Sales Process or Negotiations ............. 72

E. The Special Committee Knew the Process was Unfair Because it Allowed Vista to Restore its Prior Files, Which Provided More Comprehensive Data Than the 2023 Process ........................................ 72

F. The Special Committee and General Atlantic Ignored Evercore's Advice to Test the Market for Majority Interest ........................................ 73

G. Francisco Partners Was Disappointed They Were Never Informed That a Majority Deal Was on the Table ........................................ 73

H. CEO Bennett Was Motivated to Sell the Company to Vista Because a Majority Deal Qualified as a Change in Control, Entitling Bennett and Other Executives to Lucrative Payments ........................................ 73

IV. LOSS CAUSATION ........................................ 76

V. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................ 78

VI. CLASS ACTION ALLEGATIONS ........................................ 79

VII. PRESUMPTION OF RELIANCE ........................................ 81

COUNT I Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder ........................................ 84

COUNT II Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ........................................ 85

COUNT III Against the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic for Violations of Section 20(a) of the Exchange Act ........................................ 87

VIII. PRAYER FOR RELIEF ........................................ 89

IX. JURY DEMAND ........................................ 90

AltShares Event-Driven ETF, The Arbitrage Fund, and the Hilary L. Shane Revocable Trust (together, "Plaintiffs") bring this class action (the "Class Action") for violations of:

(i) 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 promulgated thereunder, on behalf of themselves and other public holders of EngageSmart, Inc. ("EngageSmart" or the "Company") common stock (the "Unaffiliated Stockholders") as of the December 21, 2023 record date (the "Record Date") who were entitled to vote on the "take-private" acquisition (the "Merger") of the Company by Vista Equity Partners Management, LLC and its affiliates (collectively, "Vista"); and

(ii) Sections 10(b) and 20(a) of the Exchange Act, §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, on behalf of themselves and all other persons or entities (excluding Defendants, defined more fully below) who sold shares of EngageSmart common stock from October 23, 2023, the announcement date of the Merger, through the close of the Merger on January 26, 2024 (the "Class Period"), including those who sold into the Merger and were damaged thereby (together with the Unaffiliated Stockholders, the "Class" or "Class Members").

These claims are variously asserted against: (i) EngageSmart; (ii) the Company's board of directors (the "EngageSmart Board" or "Board Defendants"); (iii) the special committee of the EngageSmart Board purportedly established to oversee the sales process resulting in the Merger (the "Special Committee" or "Special Committee Defendants"); (iv) certain Company executives (the "Officer Defendants" and, together, with EngageSmart, the Board Defendants and Special Committee Defendants, the "EngageSmart Defendants"); (v) General Atlantic, L.P. and its affiliates ("General Atlantic"), EngageSmart's former majority and controlling shareholder and a current 35% owner of EngageSmart following the completion of the Merger; and (vi) Vista, which acquired a majority interest in EngageSmart through the Merger and is a current 65% post-Merger owner of EngageSmart (all together, the "Defendants").

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon the ongoing investigation by undersigned counsel, including review and analysis of: (i) public filings by EngageSmart,

General Atlantic, and Vista; (ii) press releases and other public statements; (iii) media and analyst reports about the Company; (iv) unredacted complaints produced to Plaintiffs pursuant to a challenge to confidential treatment filed under Delaware Chancery Rule 5.1 in the cases captioned *In re EngageSmart, Inc. Stockholder Litigation*, No. 2023-1093-JTL (Del. Ch.) and *Oklahoma Law Enforcement Retirement System v. Bennett, et al.*, No. 2024-0760 (Del. Ch.) (collectively, the "Delaware Chancery Court Actions"), and a confidentiality agreement executed among Plaintiffs and Defendants; and (v) publicly filed pleadings in other proceedings, including the Delaware Chancery Court Actions for breach of fiduciary duty brought by shareholders in the Delaware Court of Chancery.

## INTRODUCTION

1. This securities class action seeks compensation for EngageSmart's unaffiliated stockholders for the economic injury caused by Defendants' false statements and concealment of the truth concerning Vista's January 2024 take-private acquisition of EngageSmart at a price of $23 per share (the "Merger" as defined above).

2. To obtain their approval for the Merger, EngageSmart's Unaffiliated Stockholders were falsely assured that the Merger was the result of a fair process, actively overseen by an unconflicted special committee and advised by bankers at Evercore who sought to maximize the value received by those unaffiliated stockholders. In reality, the process was directed by EngageSmart's dominant shareholder, General Atlantic, through advisors at Goldman Sachs & Co. LLC ("Goldman") who were explicitly working to ensure that General Atlantic's preferred deal was approved.

3. Unaffiliated Stockholders were further falsely assured, through a series of misrepresentations and omissions, including in the Proxy, that the Merger price of $23 per share was the best value they could expect to receive for their EngageSmart stock. In reality, General

Atlantic and Goldman effectively sidelined or excluded any competition to Vista. This exclusion was achieved by (i) severely limiting the number of potential buyers who were contacted, falsely telling those bidders that General Atlantic would only entertain offers that allowed General Atlantic to retain a majority stake in EngageSmart, thus ensuring that those bidders would not offer prices reflecting a "control premium," (ii) refusing to give other bidders time to catch up with the diligence conducted by Vista, and permitted by the Special Committee, prior to the process, (iii) leaking information about the other bids to Vista, (iv) ignoring inbound expressions of interest, and (v) running a sham "go shop" after the Merger agreement was announced.

4. More specifically, and among other things, EngageSmart's stockholders were falsely told, or misled to believe that:

- Goldman acted as a financial advisor to EngageSmart, when, in fact Goldman was at all times acting on behalf of General Atlantic with respect to this Merger, had other undisclosed relationships with General Atlantic, and therefore steered the process to General Atlantic's preferred deal with Vista, rather than maximizing the Merger Price paid to Unaffiliated Stockholders;

- the full EngageSmart Board recommended shareholder approval of the Merger because of the "***procedural fairness***"[1] of the process and that the Board believed the deal was "advisable, fair to, and in the best interests of EngageSmart and the Unaffiliated Stockholders" because of "***both the substantive and procedural aspects of the Merger***," despite the systematic favoritism shown to Vista and the exclusion of other bidders, which resulted in a lower price for Unaffiliated Stockholders;

- the Special Committee had "active involvement and oversight" of the process despite the fact that General Atlantic's advisor, Goldman, dominated the process, sidelining the Special Committee and its advisors at Evercore at key moments; and

- another large investor in EngageSmart, Summit Partners ("Summit"), "would not have interests in a potential transaction that differed materially from those of the public stockholders," falsely assuring investors that Summit's interests were aligned with those of the minority stockholders when, in reality, Summit's liquidity needs and close relationship with both General Atlantic and Vista rendered it

[1] All emphasis herein is added unless otherwise noted.

thoroughly conflicted such that Summit supported a deal that was not in the unaffiliated stockholders' interest;

5. Defendants used these and other falsehoods set forth herein to obtain shareholder approval for the Merger at the undervalued price of $23 per share.

6. General Atlantic (and therefore the board members and bankers working at its behest) was motivated to keep the Merger price low. General Atlantic rolled over its equity on a tax-free basis, which was much more valuable than if General Atlantic had completely cashed out its holdings. For example, General Atlantic only needed to roll over shares representing approximately 26% of the pre-closing equity for 35% of the post-close equity due to the use of debt to partially fund the transaction. And General Atlantic's base case model projected a 19% internal rate of return ("IRR") for its rollover, or an incremental net gain of $1.3 billion. Meanwhile, because the Special Committee failed to advocate for the interests of the minority stockholders, the Unaffiliated Stockholders were cashed out at an inadequate price. Indeed, Vista had internally contemplated paying $27 per share (while still meeting its required returns), and its Investment Committee had already authorized up to $24 per share.

7. Prior to the Merger, General Atlantic owned a majority of EngageSmart's outstanding shares and also possessed a suite of potent contractual control rights, including a right to hand-pick a majority of the members of the EngageSmart Board. For years before the Merger, General Atlantic desired a transaction that would allow it to both liquidate a substantial portion of its investment in EngageSmart *and* retain a significant equity interest in EngageSmart going forward. Even though General Atlantic was open to the idea of selling a majority stake of EngageSmart to the right bidder, General Atlantic refused to allow the Special Committee to solicit offers for anything other than a minority investment in EngageSmart that would cash out public

stockholders, provide significant liquidity to General Atlantic, and keep General Atlantic in control.

8. General Atlantic instructed its financial advisor, Goldman, to begin work towards such a transaction. Critically, Goldman understood that its mandate was not to maximize the per-share value at which EngageSmart would be sold. Because General Atlantic wanted to retain an interest going forward, General Atlantic was incentivized to keep the price paid to the Unaffiliated Stockholders manageably low. As Goldman recognized in internal email communications subsequently revealed in state court litigation: "*[o]n the primary scenario we are selling equity and rolling at the deal price so we will care about [the price] being higher vs. lower*"; on the other hand, "*[o]f course we are effectively buying out the public at that price with the leverage too so that cuts the other way*."

9. In addition to working with and in the interests of General Atlantic on this Merger, Goldman was motivated to please General Atlantic because of its wide-ranging and long-term relationship with the private equity firm, including multiple retentions by General Atlantic portfolio companies totaling over $100 million in the prior two years, outstanding loans worth hundreds of millions more, ongoing other engagements, and massive co-investments in other enterprises. Goldman was also concurrently advising Vista on another transaction and had just provided Vista with a $1.5 billion loan. Furthermore, Goldman's $36 million fee for work ostensibly advising EngageSmart was entirely contingent on a transaction being completed.

10. Goldman realized the fraught nature of this project, acknowledging internally that "*Plaintiffs' litigation is almost a certainty*" and that deal team members should be judicious in considering "*[w]hat should be talked about / written down*." Goldman also recognized it was likely the EngageSmart Board would need to form a Special Committee of putatively independent directors to consider such a transaction and that it would be necessary to take steps to limit the

influence of such a Special Committee. To that end, General Atlantic acted to position Goldman to control the Special Committee's sales process from the inside.

11. Defendant Stamas—a General Atlantic executive and the Chairman of the EngageSmart Board—determined that Goldman should represent EngageSmart as its principal financial advisor in connection with exploring a potential sale of the Company. Goldman's own in-house counsel voiced serious apprehensions about Goldman agreeing to serve as EngageSmart's advisor, considering that Goldman was already working as General Atlantic's advisor. But Goldman went along with the plan, and its role was approved by a two-member Special Committee of the EngageSmart Board that was itself conflicted. The Special Committee subsequently hired its own financial advisor, Evercore, but Goldman exercised all meaningful control over the sales process to the exclusion of Evercore—and, by extension, the Special Committee. Evercore's strategic proposals were consistently overridden by Goldman, Goldman conducted critical conversations with potential bidders outside Evercore's presence, and Evercore was left to consistently complain about being denied meaningful involvement in the process by Goldman. Indeed, even during the final week of the sales process, Evercore was left to complain about *still* being denied access to certain deal folders, being denied access to EngageSmart's virtual data room, and being excluded from key conversations between Goldman and bidders for the Company.

12. Unbeknownst to Investors, the Special Committee and Evercore effectively ceded control over the sales process to Goldman and General Atlantic—despite knowing that General Atlantic's direction to Goldman was for it to maximize General Atlantic's IRR on its rollover stake rather than to maximize the price paid to public shareholders. Sidelined, Evercore and the Special Committee allowed Goldman to take steps to ensure that the process resulted in General Atlantic's desired outcome: a control deal with Vista that maximized General Atlantic's IRR. The process run by Goldman on behalf of EngageSmart was essentially a charade, as competing bidders

appeared to recognize at the conclusion of the process. Specifically, Goldman insisted—over Evercore's objection—that all prospective bidders contacted in connection with the sales process be informed, in no uncertain terms, that only a deal for a minority stake in the Company was possible. All potential market buyers, other than Vista, were led to believe that a deal to acquire a majority stake in EngageSmart was an impossibility; the only deal "on offer" was to purchase a large minority stake in the Company and become a junior partner in a company still controlled by General Atlantic. Meanwhile, General Atlantic and EngageSmart engaged in conversations with Vista outside the presence of the Special Committee that left Vista with the understanding that General Atlantic *would* support a sale of a controlling interest in the Company. Specifically, Vista's internal notes concerning a July 2023 outreach from General Atlantic reflect Vista's understanding that "*GA is okay being a minority partner.*"

13. This dynamic badly distorted the sales process, considering that a majority position—which would allow a buyer to control the business—would be significantly more valuable and more attractive to many buyers. By telling all bidders other than Vista that only a minority sale was on offer, General Atlantic and Goldman essentially guaranteed that Vista would come out ahead in the process, which is precisely what happened. Other bidders, as directed, submitted bids for a minority position—but those bids were lower than bidders would have offered for a majority position. Francisco Partners, which bid up to $21 for a minority stake in the Company, made this explicit. It told Goldman and Evercore that it "*prefer[ed] to do a majority deal and control the business but that wasn't on offer*." Meanwhile, Goldman further tilted the sales process in Vista's favor by denying other bidders sufficient diligence, while Vista was permitted to "restore" the significantly more comprehensive diligence it had received in connection with its negotiations with EngageSmart in 2022. Francisco Partners expressly stated

that it was "[d]isappointed with the level of data sharing" and lacked sufficient diligence to make an improved bid for the Company.

14. Vista, seizing on the advantages afforded to it, eventually proposed a deal to acquire a majority stake in EngageSmart, with General Atlantic remaining a substantial minority stockholder, for $22.75 per share. Within just three days, and without contacting Francisco Partners or any other bidder to determine what terms they might offer for a majority stake, the Special Committee agreed to a final deal for a majority sale to Vista, albeit at the modestly improved price of $23 per share. Notably, Goldman and General Atlantic perceived that $23 was not the highest price Vista would pay but declined to push for a higher price because a higher price for Unaffiliated Stockholders would have meant less liquidity for General Atlantic.

15. Upon receiving General Atlantic's "ok to [the] price" at $23, the Special Committee approved the deal—without pushing to find out the maximum that Vista would be willing to pay (Vista's internal files suggested $24) or whether Francisco Partners or other bidders might be willing to pay more for a majority deal. Upon announcement of the deal, multiple sophisticated bidders expressed their incredulity at how the process had been conducted. Francisco Partners, in particular, reached out to Evercore to complain and express its "[d]isappoint[ment]" and "frustrat[ion]" that the "deal turned into [a] majority" because Goldman "told them multiple times there was no majority deal." The clear indication is that Francisco Partners believed it could have competed with Vista and potentially offered a superior deal if it knew a majority deal was on the table.

16. In subsequent public statements touting the Merger to investors—including in an October 23, 2023 press release announcing the Merger (the "Merger Press Release") and in a December 19, 2023 definitive proxy statement (the "Proxy") soliciting the Unaffiliated Stockholders' votes in favor of the Merger and purporting to inform the Unaffiliated Stockholders

concerning their appraisal rights—Defendants acted to conceal all of this and instead painted a picture of a fair and robust process that maximized value for EngageSmart stockholders.

17. Defendants touted, for example, the "*procedural fairness*" of the Merger process, highlighting the purportedly independent Special Committee's "*active oversight of the negotiation process*," that the Merger was "*negotiated by the Special Committee*," and that "*the Special Committee had independent control of the extensive negotiations*." All of this was at least materially misleading. It elided that the process was, in reality, controlled by Goldman—which acted to advance General Atlantic's unique interests at every turn—who repeatedly boxed out the Special Committee and its advisors, rather than run a truly fair process. Defendants compounded this disclosure failure by characterizing Goldman as "*exclusive financial advisor to EngageSmart*"—when, in fact, Goldman's loyalties were divided throughout the process—and by failing to disclose numerous additional material facts concerning conflicts of interest that would give stockholders reason to doubt the independence of Goldman, Evercore, and even the Special Committee itself. Defendants also omitted numerous critical facts concerning the sales process, demonstrating the myriad ways in which these conflicts of interest operated to permit General Atlantic's interests, and its preferred deal with Vista, to prevail over the interests of Unaffiliated Stockholders and superior alternatives that could have been realized if EngageSmart had run a fair process designed to maximize stockholder value.

18. Defendants' myriad material misstatements and omissions of material facts in the Proxy and related filings are detailed extensively herein. Those misstatements denied Plaintiffs their statutory right to evaluate the Merger on an informed basis and caused them to accept Merger consideration that failed to adequately value EngageSmart common stock, for which they could have received higher consideration through a truly fair and impartial sales process. Likewise, Defendants' materially false and misleading statements and omissions of material facts in the

Proxy and related filings caused Class Members to sell their stock into the Merger at a price that failed to adequately reflect the true value of EngageSmart common stock, instead of rejecting the Merger consideration at the ballot box or exercising their statutory stockholder appraisal rights.

19. Through this Class Action, Plaintiffs seek to hold Defendants liable for their misrepresentations and to recover damages for the harm stockholders incurred as a result thereof. Plaintiffs assert three counts:

(i) Count I against all Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9) for material misstatements and omissions of material facts in the Proxy;

(ii) Count II against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § § 240.10b-5) for untrue statements of a material facts and omissions of material facts during the Class Period as set forth herein; and

(iii) Count III against the EngageSmart Defendants and General Atlantic under Section 20(a) of the Exchange Act as control persons for the violations of the Exchange Act.

## PARTIES

### A. Plaintiffs

20. Plaintiff AltShares Event-Driven ETF ("AltShares") is an exchange-traded investment fund formed in 2014 and organized under Delaware law.

21. Plaintiff The Arbitrage Fund is an investment fund formed in 2000 and organized under Delaware law.

22. Plaintiffs AltShares and The Arbitrage Fund are both advised by Water Island Capital, LLC, a New York domiciled SEC registered entity.

23. Plaintiff Hilary L. Shane Revocable Trust is a private trust organized under Florida law.

24. As set forth in the attached certifications, each of the three Plaintiffs held and were beneficial owners of EngageSmart common stock as of the Record Date for the Merger and were

entitled to vote on the Merger. Plaintiffs continued to hold EngageSmart common stock through the closing date of the Merger and suffered damages as a result of the Defendants' violations of the federal securities laws alleged herein.

**B. Defendants**

**1. Defendant EngageSmart**

25. EngageSmart, Inc. is a Delaware corporation headquartered in Braintree, Massachusetts. EngageSmart traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ESMT" until the Merger closed, after which it was delisted from the exchange. EngageSmart continues to exist as a subsidiary of an affiliate of Vista. As a result of the Merger, Vista affiliates hold approximately 65% of EngageSmart's equity and General Atlantic affiliates hold approximately 35% of EngageSmart's equity. EngageSmart issued the Proxy and made other false and misleading statements as alleged herein.

**2. The Special Committee Defendants**

26. Matthew G. Hamilton served as a director of EngageSmart from 2018 through the close of the Merger. Defendant Hamilton was a member of the Special Committee from June 27, 2022 to its suspension on October 27, 2022 and again from the date the suspension was revoked on July 23, 2023 until the close of the Merger. Hamilton was a Managing Director at Summit at all relevant times and was Summit's nominee to the Board. Defendant Hamilton previously served on the board of directors of Invoice-Cloud, EngageSmart's predecessor and a current subsidiary of the Company. As detailed below, the appointment of Hamilton to the Special Committee was highly problematic and caused conflicts of interest: although Hamilton was not employed by General Atlantic, he was employed by Summit, and Summit valued its relationship with General Atlantic over its minority position in EngageSmart.

27. Diego Rodriguez served as a director of EngageSmart from 2022 through the close of the Merger. Defendant Rodriguez was a member of the Special Committee from June 27, 2022 to its suspension on October 27, 2022, and again from the date the suspension was revoked on July 23, 2023 until the close of the Merger. Rodriguez was recommended by Goldman to serve as a director.

28. Defendants Hamilton and Rodriguez—who comprised the Special Committee in the relevant period leading to the Merger and are referred to herein as the "Special Committee Defendants"—opined to Unaffiliated Stockholders that the Merger Agreement was "advisable, fair to, and in the best interests of EngageSmart and the Unaffiliated Stockholders," recommended that the Unaffiliated Stockholders vote in favor of the Merger, and caused that recommendation to be included in the Proxy, despite the undisclosed conflicts and deficiencies in the sales process.

**3. The Board Defendants**

29. Deborah A. Dunnam served as a director of EngageSmart from 2021 through the close of the Merger. Defendant Dunnam was a member of the Special Committee from June 27, 2022 to its suspension on October 27, 2022 but did not serve on the Special Committee after the suspension was revoked on July 23, 2023, purportedly due to the fact she had recently been "introduced to a professional opportunity by General Atlantic."

30. Preston McKenzie served as a director of EngageSmart from 2019 through the close of the Merger. Defendant McKenzie was an Operating Partner at General Atlantic at all relevant times and was a General Atlantic nominee to the Board.

31. David Mangum served as a director of EngageSmart from 2019 through the close of the Merger. Defendant Mangum was a Senior Advisor at General Atlantic at all relevant times and was a General Atlantic nominee to the Board.

32. Raph Osnoss served as a director of EngageSmart from 2019 through the close of the Merger. Defendant Osnoss was a Managing Director at General Atlantic at all relevant times and was a General Atlantic nominee to the Board.

33. Robert P. Bennett is the founder of EngageSmart and served as the Company's Chief Executive Officer ("CEO") and as a director of EngageSmart from the Company's initial public offering in 2019 through the close of the Merger. Defendant Bennett served as CEO of EngageSmart following the Merger until April 2024. Defendant Bennett previously served as CEO of Invoice-Cloud.

34. Paul G. Stamas served as Chairman of the EngageSmart Board from 2019 through the close of the Merger. Defendant Stamas was a Managing Director at General Atlantic at all relevant times and was a General Atlantic nominee to the Board. Stamas signed the Proxy.

35. Defendants Bennett, Dunnam, Mangum, McKenzie, Osnoss, and Stamas, along with Defendants Hamilton and Rodriguez, are collectively referred to herein as the "Board Defendants." The Board Defendants caused the Proxy to be issued and purportedly determined that the Merger Agreement was "advisable, fair to, and in the best interests of EngageSmart and its Stockholders," recommended that the Unaffiliated Stockholders vote in favor of the Merger, and caused that recommendation to be included in the Proxy, despite the undisclosed conflicts and deficiencies in the sales process.

**4. The Officer Defendants**

36. Cassandra Hudson has served as EngageSmart's Chief Financial Officer from 2020 to the present. Defendant Hudson signed EngageSmart's Form 8-K filed on October 23, 2023, as well as the December 19, 2023 13E-3.

37. Defendants Hudson and CEO Bennett are together referred to herein as the "Officer Defendants." The Officer Defendants signed or caused EngageSmart to file the Forms 8-K, the

13E-3, and/or the Proxy that contained false or misleading statements of material facts or omitted material facts necessary to make the statements therein not false or misleading.

**5. Defendant General Atlantic**

38. General Atlantic, L.P. (along with its subsidiaries and affiliates), a Delaware Limited Partnership, is a global investment firm with $83 billion in assets under management that provides capital and strategic support for 227 current portfolio companies worldwide. Immediately prior to the Merger, General Atlantic owned approximately 52% of the common stock of EngageSmart and was the Company's controlling stockholder.

39. As set forth herein, beginning in 2022, General Atlantic sought a strategic transaction that would monetize and generate liquidity from its five-year investment in EngageSmart but allow General Atlantic to maintain its status as controlling shareholder or, at the very least, to rollover some of its equity interest into the post-transaction Company to maintain some upside exposure.

40. General Atlantic made specific representations in the Proxy concerning General Atlantic's "position" on the fairness of the Merger and the bases for that position and otherwise permitted its name to be used to solicit consent for the Merger from Unaffiliated Stockholders through the Proxy, that, as set forth herein, contained false or misleading statements of material facts or omitted material facts necessary in order to make the statements in the Proxy materials not false or misleading.

41. General Atlantic also jointly with EngageSmart and Vista filed the Schedule 13E-3 for the Merger that repeated Defendants' prior statements about the sales process for the Merger, including the material misstatements and omissions of material facts concerning the conflicted nature of the Special Committee's and Board's recommendations and the sales process overall.

#### 6. Defendant Vista

42. Vista Equity Partners Management, LLC (along with its subsidiaries and affiliates), a Delaware limited liability company, is a global firm with more than $100 billion in assets under management that exclusively invests in enterprise software, data and technology-enabled organizations. In January 2024, Vista and its affiliates acquired approximately 65% of the equity of EngageSmart through the take-private Merger.

43. Vista made specific representations in the Proxy concerning Vista's "position" on the fairness of the Merger and the bases for that position, and otherwise permitted its name to be used to solicit consent for the Merger from Unaffiliated Stockholders through the Proxy, that, as set forth herein, contained false or misleading statements of material facts or omitted material facts necessary in order to make the statements in the Proxy materials not false or misleading.

44. Vista also jointly with EngageSmart and General Atlantic filed the Schedule 13E-3 for the Merger that repeated Defendants' prior statements about the sales process for the Merger, including the material misstatements and omissions of material facts concerning the conflicted nature of the Special Committee's and Board's recommendations and the sales process overall.

## I. FACTUAL BACKGROUND

### A. General Atlantic's Ownership and Governance Rights Over EngageSmart

45. EngageSmart provides vertically tailored customer engagement software and integrated payments solutions through two segments: (i) its SMB Solutions segment, which provides end-to-end practice management solutions geared toward the health-and-wellness industry; and (ii) its Enterprise Solutions segment, which provides Software-as-a-Service (SaaS) solutions that simplify electronic billing and digital payments. Defendant Bennett founded EngageSmart (which was then known as InvoiceCloud) in 2009. The Company has grown

immensely. By 2018, the Company was servicing 25,000 clients; by the time of the Merger, the Company had over 100,000 customers.

46. The Company's growth was spurred by large private equity investments. Defendant General Atlantic and Summit have historically invested in the same projects, as was the case with EngageSmart. In January 2015, Summit made a venture investment in EngageSmart, and in December 2018, General Atlantic followed with a significantly larger investment and became the majority owner of the Company. For the seven years between 2017 and 2024, General Atlantic infused hundreds of millions in capital into at least seven Summit-backed ventures, showcasing their consistent partnership in co-investing in promising projects.

47. Three years after General Atlantic's investment, on September 27, 2021, EngageSmart completed an initial public offering (the "IPO") of 13.6 million shares of EngageSmart common stock at a price of $26.00 per share, for net proceeds of $326.4 million and a $4.2 billion valuation. Goldman was one of the main underwriters for the IPO. Following the IPO, General Atlantic owned 97.2 million shares consisting of 59.9% of the equity, and Summit owned 26.9 million shares consisting of 16.6% of the equity. At the closing price on the first day of trading, General Atlantic's holdings were worth approximately $3.3 billion.

48. Following the IPO and until the Merger, General Atlantic and Summit enjoyed contractual rights to designate members of the Board and, ultimately, control the Company. Pursuant to a stockholder agreement executed in connection with the IPO (the "Stockholder Agreement"), as long as General Atlantic beneficially owned over 50% of the common stock, it was entitled to nominate five of EngageSmart's eight directors. Moreover, General Atlantic had the right to appoint at least one member to each of the Board's committees. Provided Summit beneficially owned at least 10% of the common stock, it was entitled to nominate one director. At

all times from the IPO to the Merger, General Atlantic and Summit owned at least 52% and 15%, respectively, of the Company's common stock.

49. Exercising its contractual rights, General Atlantic filled the Board with four of its employees—Defendants Stamas, Mangum, McKenzie, and Osnoss—and recommended the nomination of a fifth director, Defendant Dunnam. Summit used its seat to appoint Defendant Hamilton, a Summit Managing Director. The final two Board seats were filled by EngageSmart's CEO, Defendant Bennett, and Defendant Rodriguez who was recommended for service on the Board by Goldman—General Atlantic's longtime financial advisor.

50. In addition to controlling the composition of the Board, General Atlantic was entitled to exercise control over significant transactions. Specifically, under the Stockholder Agreement, EngageSmart was precluded from any "Major Actions"—including a merger—without General Atlantic's express written consent.

51. At the same time that General Atlantic, Summit, and the Company entered the Stockholder Agreement, EngageSmart adopted its Certificate of Incorporation, which included a so-called "Equal Treatment Clause." That Clause provided:

> Except as otherwise required by law or expressly provided in this Certificate of Incorporation, each share of Common Stock shall have the same powers, rights and privileges and shall rank equally, share ratably and be identical in all respects as to all matters.

52. The plain language of the Equal Treatment Clause required that any consideration from a merger be distributed *pro rata* among the Company's stockholders, with no stockholder (controlling or otherwise) treated differently from other stockholders. Clauses like these are often adopted by public companies with controlling stockholders to minimize or eliminate any stock price discount for minority stockholders resulting from their status as controlled companies.

53. As described herein, the Merger allowed General Atlantic to liquidate a large portion of its EngageSmart holdings while rolling over a 35% equity stake into the surviving private company. On the other hand, the Unaffiliated Stockholders were completely cashed out of their EngageSmart investments. Because General Atlantic was not treated identically to the Unaffiliated Stockholders, the Merger violated the Equal Treatment Clause.

### B. Following EngageSmart's IPO, General Atlantic Attempts to Liquidate a Portion of Its Investment

54. Around the time of the IPO, General Atlantic began looking for ways to gain liquidity for its roughly $3.3 billion in EngageSmart holdings. Indeed, in January 2021 (*i.e.,* months before the IPO), Vista and General Atlantic—along with various bankers—engaged in multiple conversations about a potential transaction involving EngageSmart and Vista.

55. Vista is a highly successful private equity firm that primarily invests in software and technology companies. Vista has more than $100 billion in assets under management, and, according to public statements by Vista's CEO, Robert Smith, has ***never*** lost money on a buy-out deal. Vista's record is especially notable in the private equity industry, which is known for big hits and big misses. According to numerous public reports, Vista's exceptional record of success is owed to the firm's secret operating manual. The manual, known as "Vista's Best Practices," reportedly "transform[s] business-software companies into profit machines."[2] According to one longtime Vista investor, Grosvenor Capital Management, "their process is like a factory. A deal comes in and it gets compartmentalized, and they apply experts on each compartment. After it

[2] Miriam Gottfried and Laura Cooper, "Billionaire's Secret Buyout Formula: 110 Instructions and an Intelligence Test," WALL STREET JOURNAL (Jul. 9, 2018), https://www.wsj.com/articles/billionaires-secret-buyout-formula-110-instructions-and-an-intelligence-test-1531151197

goes off the assembly line, the margins are higher." The *Wall Street Journal* has reported on Vista's expertise in operating acquired companies as follows:

> Members of the firm's 100-person Vista Consulting Group, or VCG, then swoop in. Some set to work revamping the company's contracts and building in automatic price increases and renewals, with the goal of increasing recurring revenue and lowering the risk customers will defect.
>
> Vista also overhauls the sales process, encouraging cross-selling of products, through commissions.[3]

Vista's largest fund has consistently been in the top quartile of comparable funds formed the same year, as measured by annualized returns after fees.[4] Accordingly, partnering alongside Vista tends to be a highly successful strategy for other investors, like General Atlantic.

56. Understanding that General Atlantic did not obtain any liquidity as a result of the EngageSmart IPO, Vista contacted General Atlantic's Managing Director Stamas on March 23, 2022 to invite him to a breakfast. Before the breakfast even occurred, Stamas and EngageSmart CEO Bennett discussed retaining Goldman to analyze, among other things, an avenue to provide "[l]iquidity to shareholders" for EngageSmart. EngageSmart accordingly retained Goldman to present on potential strategic alternatives at the EngageSmart Board's upcoming May 3, 2022 meeting. There was, notably, already an avenue for public stockholders to achieve liquidity: the New York Stock Exchange. Only large blockholders—General Atlantic and Summit, in particular—would require a strategic transaction to achieve liquidity.

57. After the March 31, 2022 breakfast, Stamas introduced Vista to EngageSmart CEO Bennett and explained that Vista was interested in "start[ing] a dialogue" regarding a potential transaction for the Company. As would become a pattern over the following two years, this led to

---

[3] *Id.*

[4] *Id.*

a series of meetings and discussions between EngageSmart, General Atlantic, and Vista, that were neither known to, nor overseen by, the EngageSmart Board. Indeed, those parties met no less than six times between April 22, 2022 and June 11, 2022—all outside the presence, supervision, and knowledge of EngageSmart's Board members who were not affiliated with General Atlantic. During these discussions, Vista was informed that General Atlantic was open to a whole-company transaction that would take EngageSmart private, and that General Atlantic was looking to roll over about 50% of its equity in any transaction. That is, General Atlantic desired to gain liquidity for approximately half of its stake in EngageSmart.

58. The EngageSmart Board held its regular meeting on May 3, 2022, where it was not informed about the ongoing substantive discussions with Vista. Goldman presented at the meeting and explained that EngageSmart was performing very well, especially as compared to "the Tech IPO Cohort," but that "the Market is Not Rewarding that Performance." Goldman outlined a number of potential strategic alternatives EngageSmart could undertake and informed the Board that Goldman had calculated illustrative present values for EngageSmart's future stock price, forecasting a share price between $29.71 and $41.16 by 2024. Given that EngageSmart's stock closed at $21.40 that day, Goldman's projections contemplated the Company's stock price increasing between 39% and 92% in the following two years.

59. Vista, for its part, was seriously considering a transaction involving EngageSmart. Vista considered EngageSmart "the leading business mgmt. software + integrated payments offering in its respective verticals" and internally contemplated a transaction valuing Vista at $27 per share. Vista was motivated precisely because it recognized a "lack of appreciat[ion] in the public markets" which "create[ed] an attractive opportunity" to acquire EngageSmart from its present stockholders for less than the Company's true value.

### C. EngageSmart Sets Up a Conflicted Special Committee, But Vista Backs Away

60. With discussions between General Atlantic, Vista, and EngageSmart sufficiently advanced—and with those parties contemplating a transaction that would involve General Atlantic rolling over a significant portion of its equity in the Company, an opportunity not to be afforded to public stockholders—Defendants decided it was time for EngageSmart to form a "Special Committee" that would ostensibly protect the interests of the Company's minority stockholders. On June 27, 2022, the full EngageSmart Board was finally apprised of the "potential transaction" with Vista and determined that a Special Committee independent of General Atlantic was necessary to oversee—or cleanse—the already well-advanced process. The Board appointed non-General Atlantic employees Dunnam, Hamilton, and Rodriguez to serve on the Special Committee.

61. The appointment of Hamilton to the Special Committee was highly problematic: although Hamilton was not employed by General Atlantic, he was employed by Summit, and Summit valued its relationship with General Atlantic over its minority position in EngageSmart. Indeed, Summit had extensive investments with General Atlantic and benefitted from at least *seven* transactions in *seven* years where General Atlantic directly infused capital into Summit or into Summit portfolio companies. Summit, and therefore Hamilton, had an overwhelming interest in pleasing General Atlantic so that Summit could continue to benefit from that relationship for years to come. Hamilton was even personally involved in Summit's co-investment alongside General Atlantic in a company named Morphe Holdings in 2019.

62. Summit, moreover, shared General Atlantic's interest in liquidating its substantial investment in EngageSmart dating back to before the IPO. Considering the size of its block of shares, meaningful liquidity could not have been easily obtained through open-market sales. A typical private equity investment expects to return cash to investors within 10 years. Summit invested in EngageSmart via funds created in 2008 through 2014. With Summit's funds nearing

the end of this lifecycle, Summit was motivated to liquidate, even if it meant leaving some cash on the table, so that Summit could provide a return to its investors. An open-market sale was not an option for Summit because a sale of its large equity position—approximately 15% of the Company—would likely cause a significant decline in EngageSmart's stock price. Indeed, General Atlantic expressly recognized Summit's need to exit its EngageSmart investment and even included a line item labeled "Summit Liquidity" when analyzing potential EngageSmart transactions. In sum, Summit's interests in any potential strategic transaction were more closely aligned with General Atlantic's than with the Company's other minority stockholders.

63. Compounding the conflict created by its alignment and longstanding strategic relationship with General Atlantic, Hamilton and Summit were also conflicted vis-a-vis Vista. Vista and Summit had made at least four large scale co-investments in the same companies between 2014 and 2020, including a 2017 transaction in which Vista acquired a software company from Summit directly and a 2018 transaction in which Vista made a majority investment in a Summit-backed company in a deal valued at over $1 billion. Notably, the Proxy makes no reference to prior dealings between Summit and Vista even though the relationship could reasonably be expected to cause Hamilton to favor Vista over other bidders with which Summit did not enjoy the same longstanding relationship and history of profitable dealings.

64. The Special Committee met on July 1, 2022 and decided to retain Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its counsel. Next, despite Hamilton's connection to Summit, the Special Committee discussed "any potential role of General Atlantic and Summit" in a transaction. After hearing an update on the ongoing discussions between Vista, General Atlantic, and EngageSmart, the Special Committee analyzed the need to retain an independent financial advisor. This reflected that the Special Committee fully understood that Goldman was not fit for the job. Indeed, on July 20, 2022, Hamilton emailed colleagues at Summit explaining that

Goldman could not represent the Special Committee because it was "conflicted." He explained that the Special Committee was, accordingly, looking at a short list of potential alternative advisors, including Citigroup, Perella Weinberg, and Evercore, who did not share Goldman's "conflict[]" and could therefore handle the assignment. Strikingly, Hamilton made clear that he was not focused on retaining the best financial advisor for the situation, but rather wanted to use the engagement to directly benefit Summit, as he was specifically "*trying to curry favor with some places that tend to show us [Summit] more deal flow*."

65. After entering into a non-disclosure agreement ("NDA") on June 28, 2022, Vista conducted extensive due diligence on EngageSmart. By July 21, 2022, Vista internally concluded that EngageSmart "is a good company and we should buy it." Vista internally modeled a transaction with a $26 per share price and contemplated a structure in which Vista would own 55.6% of the post-merger entity with General Atlantic owning the remaining 44.4%. This internal analysis demonstrates that, based on its extensive interactions with General Atlantic, Vista understood that General Atlantic would not demand to retain majority ownership and would instead be open to a transaction resulting in Vista's receipt of a majority position in the Company.

66. Vista, however, backed away after the macro-economy took a sharp turn for the worse in the summer of 2022. Vista concluded that given the "current market environment" it was "better to stand down on this one for the time being." That said, Vista did not want to close the door entirely; rather, it wanted to "let this down in a way that doesn't damage the relationship or a future opportunity if the world looks different in the next year or so." Vista delivered the news on a July 27, 2022 Zoom meeting with EngageSmart CEO Bennett but stressed that the relationship was not over. EngageSmart got the message. Bennett reported back to General Atlantic and Hamilton that Vista "love[s] the business and the management team," "decided that this is a

company that they want to own and a management team that they want to back," and that "they plan[ned] to come back to us in the coming months with a specific proposal on valuation."

67. On October 27, 2022, the EngageSmart Board held a regularly scheduled meeting during which the Board determined that they no longer had any potential strategic matters requiring a Special Committee and, accordingly, suspended the Special Committee.

**D. General Atlantic Continues Its Pursuit of Liquidity**

68. General Atlantic's significant desire for liquidity did not end when Vista walked away from the 2022 discussions. Over the ensuing months, it continued to wrestle with its desire to achieve liquidity for a portion of its investment. In an internal General Atlantic email sent on August 6, 2022, for example, Stamas wrote to colleagues that he was "torn" about General Atlantic selling off some EngageSmart holdings because, on the one hand, it provided "liquidity now," but on the other hand, it would involve "selling at a lower price than we might like."

69. In September 2022, Stamas met with a Goldman representative who later reported to her peers that General Atlantic was "paralyzed" about what to do with EngageSmart and was "itching to begin the [sales] process" but was also "worried about the optics of selling at these levels," and only wanted to run an "abbreviated public process." Then, in October 2022, Stamas told Goldman that General Atlantic is looking to "cash out $500-$1bn." Later that month, on October 26, 2022, Goldman shared an analysis with General Atlantic contemplating a take-private deal for EngageSmart with a $26 per share sales price and General Atlantic retaining a minority 49% interest in the private company. While Goldman did not move forward with its analysis at that time, the idea that General Atlantic would sell a majority stake in EngageSmart persisted. Notably, the valuation and resulting structure shared by Goldman mirrored Vista's own internal analysis from the prior summer: a deal at $26 per share resulting in General Atlantic retaining a large minority stake rather than majority control over the Company.

70. In the meantime, General Atlantic and Summit generated modest liquidity from their EngageSmart investments when, together with Officer Defendants Bennett and Hudson, they sold eight million EngageSmart common shares in a secondary offering held on March 1, 2023 at a price to the public of $19.00 per share—well below the $26 per share previously floated by Goldman, thereby evidencing both General Atlantic's and Summit's willingness to sell below true value to generate cash. The secondary offering was handled by Citigroup and generated over $126 million for General Atlantic and approximately $35 million for Summit.

71. General Atlantic's desire to monetize its EngageSmart holdings was further evidenced by follow-up emails between General Atlantic and Citigroup. On June 20, 2023, Citigroup told General Atlantic that the market was "focused on GA monetization plans" and Citigroup wanted to "revisit[] potential monetization strategies for GA." Citigroup, for its part, "Continued [to] focus on sizing, structure and execution format" for an "orderly monetization of GA's remaining stake." Internally, General Atlantic was contemplating its options, including the possibility of making "block trades next year to continue monetizing."

### E. General Atlantic and Goldman Restart the Sales Process with an Understanding That Maximizing the Purchase Price Is Not in General Atlantic's Best Interests

72. In June 2023, without Board knowledge, General Atlantic asked Goldman to restart work towards a sales process designed to monetize General Atlantic's EngageSmart holdings. An internal Goldman email from June 22, 2023, explained that "GA has confidentially asked us to run take private math for EngageSmart…. GA, who owns just over 50% of the company, plan to roll their stake and look for a partner to buy the rest."

73. Given General Atlantic's dual goals of retaining equity in EngageSmart while also generating liquidity for General Atlantic, Goldman understood that maximizing the purchase price was not beneficial to General Atlantic. As Goldman's internal emails explained: "[o]n the primary

scenario we are selling equity and rolling at the deal price so we will care about [the price] being higher vs. lower"; however, on the other hand "*[o]f course we are effectively buying out the public at that price with the leverage too so that cuts the other way*." Thus, as Goldman recognized, General Atlantic was not incentivized to seek the highest price possible for minority stockholders. Instead, General Atlantic was incentivized to realize a price high enough to provide General Atlantic with sufficient liquidity, but low enough to keep the purchase price of minority shareholders manageable from the perspective of General Atlantic and other post-merger stockholders. Accordingly, when Goldman's internal draft materials on July 5, 2023 showed analyses of purchase prices ranging from $20 to $30 dollars per share, Jeff Gido—the Global Head of Goldman's Financial Technology Sector—instructed the team to "*stop at $27*."

74. Notably, throughout its internal conversations concerning the engagement, Goldman repeatedly used the term "we" in reference to General Atlantic, underscoring that Goldman viewed its job as advancing General Atlantic's interests—not EngageSmart's. In fact, multiple deal participants, including Goldman itself, noted Goldman's improper focus on aiding General Atlantic. Goldman's initial draft materials set forth benefits for a potential transaction where General Atlantic would retain a majority interest in EngageSmart by noting that such a structure: "Allows <u>GA</u> to maximize future upside and drive strategic vision" and provides "Potential for <u>GA</u> to monetize some stake." In response, David Freidland, a Goldman Managing Director, warned that "**In the minority sale rationale can we make those first 2 bullets less about what is good for GA and more about what is good for company and attractive to new investor**[?]" and "**So maybe delete the first one which unintentionally reads like GA getting something that others don't get**." Similarly, lawyers at Paul, Weiss, Rifkind, Wharton & Garrison LLP ("<u>Paul Weiss</u>")—counsel to General Atlantic—also suggested deleting these two

bullet points and replacing the deal rationale with something that at least appeared to benefit someone other than General Atlantic: "Near term liquidity for minority shareholders."

75. Moreover, as set forth in Goldman's July 12 presentation to General Atlantic, Goldman knew that, because General Atlantic's interests were not aligned with the minority stockholders, "*Plaintiffs' litigation is almost a certainty*" in connection with any deal along the lines that General Atlantic was contemplating. This was consistent with earlier internal Goldman documents which, strikingly, noted that "[a]ll the books and documents that get made become public" and stressed the need to consider "[w]hat should be talked about / written down."

76. Goldman also recognized that, because General Atlantic was a controlling stockholder, the "Board will form a special committee" and that the "key will be what is the committee mandate, and the litigation protection[s]." Goldman and General Atlantic knew, however, that the Special Committee would not be an obstacle in getting their preferred deal done. In an internal July 12, 2023 email, Goldman explained that a contemplated deadline for "final bids" was really window dressing because "there aren't really final bids." This was because, in Goldman's words, "**We** propose a deal and a price, **we** haggle with the committee, likely bump our price then **we** shake hands and then do the confirmatory diligence on what I would expect is an exclusive basis … Then in the end **we** either do or don't revise or just confirm our proposal based on that"—with "we" referring to General Atlantic. These facts, and many others related to Goldman's allegiance to General Atlantic, were not disclosed in the Proxy.

77. Goldman's ultimate solution to get a deal done that benefitted General Atlantic, as set forth in an internal July 12 email, was to tightly control the entire process from start to finish and limit the Special Committee's role to the greatest extent possible: "the ideal is we present a fully baked deal with price agreed between us and partner to board."

**F. EngageSmart Retains Conflicted Goldman and Reconstitutes the Conflicted Special Committee, Which Retains Conflicted Evercore**

78. Ultimately, General Atlantic determined to position Goldman to control EngageSmart's sales process from the inside. Specifically, despite Goldman's ongoing representation of General Atlantic's interests—as evidenced by Goldman's presentation to General Atlantic and Paul Weiss—Stamas, who was a General Atlantic executive and Chairman of EngageSmart's Board, concluded that Goldman could and should somehow ***also*** represent EngageSmart in the deal process. On July 17, 2023, Stamas emailed EngageSmart's general counsel Scott Semel and CEO Bennett to inform them of the decision to hire Goldman.

79. Goldman's own in-house counsel, however, was apprehensive about Goldman representing the Company given the blatant conflict between minority stockholders and General Atlantic. A July 21, 2023 internal Goldman email recounted that Goldman's counsel was "very focused that the special committee with advice from Skadden really agree and be comfortable with the company hiring us to do this. And that the special committee realize (and effectively require us) that they will be in the loop and get to sign off on or veto the things we do." This advice, however, was contrary to Goldman's internal plan to present a "fully baked deal" to the Special Committee and, therefore, was consistently flouted by both the Goldman and General Atlantic team members who worked on the deal. Indeed, the Goldman deal team consistently excluded the Special Committee from key discussions throughout the ensuing process.

80. On July 23, 2023, the Board met and reconstituted the Special Committee but removed Dunnam from participating because she had been recently "introduced to a professional opportunity" by General Atlantic and was no longer independent. Accordingly, the Special Committee now consisted of just Hamilton—who was conflicted based on Summit's unique relationship with General Atlantic and Vista—and Rodriguez. Goldman, who was now

purportedly working for EngageSmart, attended the Board meeting to discuss an overview and timeline for a sales process. The Special Committee met later that day and approved the plan for Goldman to work on behalf of EngageSmart—despite the obvious conflict—and for Goldman and General Atlantic to start compiling an initial list of private equity firms to contact. Notably, Goldman's engagement letter recognized that the Special Committee did not consider Goldman independent from General Atlantic.

81. The Special Committee acquiesced to Goldman's retention despite the fact that Goldman was seriously conflicted. Goldman's conflicts were pervasive:

i. Internal emails and documents throughout the entirety of the sales process show that Goldman viewed its role as representing General Atlantic's interests;

ii. Goldman had outstanding loans to General Atlantic for $150 million and €300 million, and was therefore interested in General Atlantic obtaining liquidity;

iii. General Atlantic and its portfolio companies had paid Goldman over $100 million in fees in the prior two years, and Goldman would do anything to keep General Atlantic as a happy client;

iv. Goldman was actively advising General Atlantic on two other transactions from which Goldman would receive lucrative fees and had marketed two billion-dollar-plus offerings for General Atlantic affiliates;

v. Goldman's investment divisions and General Atlantic had co-invested in at least six deals and had teamed up in making a $1.7 billion bid for a different company in July 2023, just as Goldman was advising EngageSmart;

vi. Goldman had received $100 million in fees from Vista in the prior two years;

vii. Members of the Goldman deal team advising General Atlantic and EngageSmart were <u>concurrently</u> advising Vista on another transaction;

viii. Goldman had provided Vista with a $1.5 billion loan in July 2023, the very month Goldman began formally representing EngageSmart; and

ix. Goldman had lent Vista and its portfolio companies in excess of $1 billion in 2023.

82. Despite these remarkable conflicts, Goldman was permitted to control key aspects of the process leading to the Merger. Goldman began by drafting a "Proposed Initial Buyer

Outreach Script" to be used when courting potential deal bidders. Although the Special Committee was informed by Paul Weiss lawyers that General Atlantic "might be receptive to exploring whole company acquisition proposals" that may "materialize" during the process, General Atlantic was "not willing to solicit whole company acquisition proposals." Thus, Goldman's proposed draft script to potential buyers made clear that "ESMT and/or GA is currently interested in exploring a deal where you [the potential bidder] would acquire ***up to 49% of the business*** and take it private." It did not include any recognition that General Atlantic would, in fact, consider a whole Company bid, or even a majority bid. This was a crucial point. The difference between a sale of "up to 49%" and a sale of more than 50% was a difference in kind, and one that would significantly influence bidder behavior. A majority position—which would allow a buyer to control the business—would be significantly more valuable and more attractive to many buyers.

83. In addition to allowing Goldman to represent EngageSmart, the Special Committee decided that it needed its own advisor as well. Defendant Hamilton—one of the two remaining Special Committee members, despite his own conflicted position—led the process of retaining a financial advisor for the Special Committee. As Hamilton expressed during the 2022 process, he only wanted the Special Committee to retain an advisor that could benefit Summit in later transactions. Hamilton immediately homed in on Evercore, who was simultaneously representing a seller that Defendant Hamilton's colleagues at Summit were pursuing at the time.

84. Aside from being chosen in a blatant ploy to benefit Summit, Evercore was also conflicted by previous relationships with each of General Atlantic, Summit, and Vista. Evercore had received approximately $41 million in fees from General Atlantic over the preceding five years, had earned $36 million in aggregate fees over the past five years from Summit and its affiliates, and received fees of $18.5 million from Vista between January 2020 and October 2023.

Each of these relationships provided incentives for Evercore to keep the deal participants' interests in mind over minority shareholders who provided no such benefits to Evercore.

85. Evercore's and Goldman's retention agreements created additional conflicts. The advisors would only receive fees if EngageSmart entered into a strategic transaction, but they would get nothing if EngageSmart remained a standalone company (an outcome that may have benefited Unaffiliated Shareholders). Although never explained in the Proxy, Evercore even requested that its retention include a fee if no transaction occurred—which would have allowed Evercore to advocate that EngageSmart remain an independent standalone company. The Special Committee, however, refused. General Atlantic later acknowledged that the multi-million dollar "success fee[s]" provided to the advisors created a perverse incentive for the advisors to approve any deal on the table. In the end, Goldman received $36 million and Evercore received $24 million from their conflicted representations.

**G. The Special Committee "Approves" the Script and Buyer List that Severely Limited the Potential Bidders**

86. On August 6, 2023, Evercore participated in an initial call with Goldman and Skadden to discuss the sales process. Evercore immediately identified problems with Goldman's proposed timing, structure, and plan for the process.

87. First, Evercore recognized there was no need to rush the process: "we/SC have time to step back and analyze strategic alternatives before moving too far down any path." General Atlantic, however, wanted to move quickly—for reasons inimical to the interests of the Company's minority stockholders. Specifically, General Atlantic was concerned that a positive earnings release by the Company in November would raise the price of the acquisition, which, as noted above, was not in General Atlantic's interests when buying out minority shareholders. In fact, Stamas texted a General Atlantic colleague explaining that the upcoming earnings announcement

"increases the desire to 'go.'" Goldman similarly had previously noted that "Paul [Stamas] wants to get moving on this ASAP to see if a deal can be achieved this year," and therefore had calendared the final bid date for October 27, 2023 so a deal was "announce[d] ***before*** earnings."

88. Second, contrary to Goldman's proposed outreach script, Evercore wanted to let potential bidders know that General Atlantic was open to considering a sale of a majority position in EngageSmart. Recognizing the significance of that point and the possibility for the sales process to be distorted if bidders believed that only a minority position was on offer, Evercore suggested edits to the script that would have informed investors that General Atlantic was "open to all value-creating alternatives" such as a "sale of the WholeCo." This suggestion was rejected by General Atlantic, who, according to an email sent by Skadden, "d[oes] not want the initial outreach by Goldman to solicit interest for or signal openness to a transaction other than the minority partner."

89. The Special Committee met again on August 8, 2023. An Evercore presentation prepared for the meeting noted that EngageSmart was outperforming its peers in revenue growth, gross margin, and adjusted EBITDA margin, but that the Company's stock price was not rewarding that performance. At the meeting, Evercore presented the Special Committee with a list of potential outreach candidates prepared by Goldman. The list included Vista, but not as a "Tier 1" candidate because Vista was expected to pursue a control deal that Evercore believed General Atlantic disfavored; however, two other relevant candidates, Francisco Partners and Hg Capital, were both in the top Tier. Notably, the list did not include any strategic buyers whatsoever. On August 9, 2023, the Special Committee approved the proposed script—which, despite Evercore's protestations, did not include Evercore's suggestion regarding a "WholeCo Sale"—and authorized Goldman to reach out to the Tier 1 candidates. Thus, all the potential bidders contacted by Goldman, including Francisco Partners and Hg Capital, were completely unaware that General Atlantic would contemplate a sale of its majority stake.

### H. Despite Conducting Outreach Exclusively for Minority Investments, General Atlantic and EngageSmart Privately Inform Vista That It Would Consider a Majority Investment

90. At the same time General Atlantic and EngageSmart were reconstituting the Special Committee and preparing to conduct outreach, Vista was underway analyzing a potential deal for EngageSmart that was similar to the one it had contemplated in 2022. Notes from a July 31, 2023 Vista meeting disclose that, although not mentioned in the Proxy, General Atlantic had privately reached out to Vista to re-start deal discussions. According to those internal Vista notes, General Atlantic's Co-President "Anton [Levy]," together with "Robert's counterpart" (a reference to Vista's CEO Robert Smith, whose counterpart at General Atlantic was CEO Bill Ford), "have reached out" as "GA is looking for a way to do a deal with us." The implication from this message was that General Atlantic specifically wanted to team up with Vista, a fact found nowhere in the Proxy. Critically, the notes revealed Vista understood from the call with Levy and Ford that "GA is looking for DPI (distribution to paid-in-capital)" [*i.e.* capital distributions to investors] and that "***culturally, GA is okay being a minority partner***."

91. Thus, while General Atlantic and Goldman continuously stressed to the Special Committee that General Atlantic was only interested in minority investments and refused to even inform outreach candidates that a majority deal was a possibility, General Atlantic tipped off Vista—and only Vista—that it would, in fact, consider a majority sale and that a driving factor for any deal was General Atlantic's need for liquidity to return capital to General Atlantic investors. Evidently, as part of its plan to control every aspect of the sales process and present a "fully baked deal" to the Special Committee, General Atlantic only wanted its preferred partner to know the true parameters of what a potential transaction could entail.

92. Despite Vista's omission from the preferred outreach list, and given Vista's prior indication that it was interested in purchasing a majority stake in EngageSmart, on August 8,

2023—the same day the Special Committee first met with Evercore—Defendant Bennett contacted Vista to explore Vista's views concerning a potential deal for EngageSmart. While it is not clear whether Bennett was aware that General Atlantic had previously contacted Vista or whether General Atlantic instructed Bennett to make the contact, it is clear that Bennett proactively courted Vista, even though the Special Committee never approved Vista as an outreach candidate.

93. Regardless of whether General Atlantic instructed Bennett to contact Vista, Bennett had his own personal reasons for preferring a Vista deal. Bennett had been CEO of EngageSmart for nearly a decade-and-a-half and was actively looking to retire. A change-in-control transaction would result in Bennett instantly benefiting to the tune of $11 million through unvested incentive awards and other change of control payments not available in a minority sale. Based on the 2022 discussions, Bennett knew Vista was interested in a majority transaction. Thus, both General Atlantic and Bennett favored Vista in a majority deal.

### I. Goldman and General Atlantic Purposely Keep the Special Committee and Evercore in the Dark

94. Following Bennett's unsanctioned outreach outside the supervision of the Special Committee, Vista reached out to General Atlantic on August 15, 2023 and held a call with General Atlantic on August 21, 2023. Bennett then met with Vista in person on September 5, 2023 and later informed General Atlantic's Stamas concerning the meeting. These communications all occurred outside the knowledge and supervision of Evercore and the Special Committee. Indeed, the Special Committee was not even informed that Vista had re-entered the process.

95. The exclusion of Evercore, or any representative of the Special Committee, from discussions with potential bidders was part of Goldman's and General Atlantic's scheme to cram through their preferred deal. Indeed, in mid-August, Goldman expressly told Evercore that it was scheduling calls with potential bidders and that "*GS would prefer that Evercore not be part of those*

*presentations* (limiting it to 1 person at GS + management + the bidders)." Accordingly, Goldman would conduct all the conversations with bidders, even though that arrangement would obviously undermine the Special Committee's ability to control the process, went directly against the advice of Goldman's own counsel, and had the obvious potential to distort the sales process because Goldman was exclusively focused on General Atlantic's interests.

96. The Special Committee soon recognized it was getting steamrolled by Goldman, which had seized control of the process and sidelined the Special Committee and its advisors from meaningful involvement in interacting with potential bidders. Accordingly, the Special Committee responded by requiring that any NDA between EngageSmart and potential bidders include a provision requiring that Evercore be included on all communications with EngageSmart but allowed bidders to speak privately with General Atlantic. Accordingly, private communications between bidders and Goldman were <u>only</u> permissible if Goldman were exclusively representing General Atlantic—and not EngageSmart. The fact that Goldman proceeded to have multiple communications with bidders without Evercore present confirms that Goldman was representing General Atlantic to the <u>exclusion</u> of EngageSmart. This was never disclosed.

97. Thereafter, Goldman continued to regularly have non-sanctioned interactions with bidders, while Evercore was forced to repeatedly complain that it was missing substantive communications. For example, Evercore's Senior Managing Director, Nathan Graf, bemoaned in a private Evercore email chain, "Should we not see the questions and who they came from . . . The [NDA] clearly states no interaction but through advisors so how come GS in receipt of bidder questions without sharing with us." The situation did not get better, as in a later email Graf instructed his team to talk to Goldman on "a more general point on why their default mode is to cut us out like the questions from buyers we still haven't seen."

98. Goldman's internal communications also reflect Evercore's minimal involvement in the process. For example, on August 19, 2023, a Goldman team member texted a colleague noting how Evercore had claimed "we're basically co-advisors" and the Goldman analyst clarified "No we're not." This exchange garnered a laughing response within Goldman. Other Goldman communications called Evercore "useless" and "delusional."

99. EngageSmart management and General Atlantic similarly viewed Evercore and the Special Committee as nuisances. EngageSmart CFO Hudson complained to Goldman about the "bureaucracy" of the Special Committee, that General Atlantic's Stamas continuously "rant[ed] about the SC process," the Special Committee caused "such wasted time," and that meetings with the Special Committee were "[s]o stupid[,] I really hope my next sales process doesn't involve a special committee." Hudson made clear that, in terms of the Special Committee, she was "just doing what I need to at this point" and not keeping them actively involved.

100. Accordingly, when other private equity firms who heard rumors that EngageSmart was open for a sale contacted EngageSmart's CEO Bennett or Goldman on August 18, August 26, August 30, and September 25, 2023, they were not directed to the Special Committee or Evercore.

**J. Evercore Again Pushes to Explore A Majority Sale, But General Atlantic Refuses**

101. The Special Committee was aware that, between August 22, 2023 and September 14, 2023, EngageSmart held management presentations with the Tier 1 bidders. However—despite direct contact between General Atlantic and Vista on July 31, 2023, and between EngageSmart management and Vista on August 8, 2023—it was not until September 19, 2023 that Evercore or the Special Committee even learned that Vista was back in the mix.

102. In late September, the Special Committee was called upon to authorize a bid process letter outlining the parameters of the potential deal to interested bidders. As with the outreach script, Evercore pushed to inform bidders that a majority transaction would be considered.

As Evercore told the Special Committee, "[a] control sale of the Company offers the potential to realize a premium to the current share price while minimizing operational execution risk and transactional complexity." Evercore further emphasized a majority sale offered the "possib[ility] that a buyer would value control sufficiently to support a higher premium than a non-control transaction" and that "[c]ertain financial sponsors prefer to invest in control deals as a structural matter, so the depth of buyer demand may be impacted by the type of transaction" presented. Accordingly, Evercore suggested that EngageSmart ask specific questions to the potential bidders about what drove their valuation and about the "proposed transaction structure." These questions were meant to assess if the bidders would "offer more for control."

103. Emails between Goldman and General Atlantic made clear their respective understanding that Evercore's suggested edits were aimed at getting bids with "a different [transaction] structure" given that the "Committee [was] focused on value maximization"—something General Atlantic and Goldman did not desire. Accordingly, General Atlantic and Goldman *struck the proposed edits* from Evercore. Evercore reported back to the Special Committee that General Atlantic was only interested in "selling a minority stake without a change of control" and the Special Committee therefore approved the bid process letter specifying that only bids for minority positions would be considered. As a result, Vista remained the only potential bidder aware that General Atlantic was "okay with being a minority partner" and might support a sale of a majority interest in EngageSmart.

104. The bid process letters were sent out on September 26, 2023 and provided a bid deadline date of October 5, 2023. Demonstrating that the entire process was designed to service General Atlantic's interests, the bid process letters also asked prospective bidders to include information about how much debt would be used to fund the transaction, information about how

the debt would be used in the transaction structure, and an estimate for how much liquidity General Atlantic would receive based on the proposed transaction.

**K. Bid Day Comes and Vista Gets More Inside Information**

105. Leading up to the bid deadline, Goldman and Evercore entertained numerous calls with potential bidders. After speaking with Goldman on October 4, 2023, Evercore summarized internally that "we'll get something between 3 to 5 bids," and that "Vista [was] now saying they may come in Monday"—*i.e.*, October 9, 2023. Apparently, the advisors were agreeable to Vista openly disregarding the bid letter's deadline.

106. On October 5, 2023, bid day, *Reuters* published an article reporting that General Atlantic was exploring a sale of EngageSmart, that several private equity firms were participating in the process, that the first-round of bidding was underway, and that initial offers were due later that day. As a result of this news, analysts began predicting a fair purchase price for EngageSmart: Raymond James analysts stated they "believe ESMT is worth between $25–28 per share in a takeout scenario"; Truist maintained a price target of $30 per share; and Baptista issued a report with a price target of $25.70 per share.

107. The public disclosure that EngageSmart was up for sale also revealed that the deal process to date had been unduly restricted. Indeed, following the public disclosure, no fewer than *eight* private equity firms that had not previously been contacted reached out to express interest in a potential deal. Naively thinking that General Atlantic and Goldman were interested in maximizing deal value, Evercore expressed internally that "inbounds may force the conversation on expanding list and potentially scope." But given General Atlantic's and Goldman's desire for only their preferred "fully baked" deal, they did not let that happen, and investors that showed inbound interest were never permitted into the process or invited to present bids.

108. EngageSmart received four bids on bid day. Pursuant to the bid process letter, three initial bids, including bids made by Francisco Partners and Hg Capital, came in for 49% of the Company, and ranged from $17 to $21 per share. The final bid offered $20–$22 per share but was limited to only a $300 million maximum, or just 9% of the outstanding shares.

109. General Atlantic was not happy with the submitted bids. Francisco Partner's bid noted that the deal's financing would not provide General Atlantic with any liquidity. General Atlantic Managing Director and EngageSmart Board member Raph Osnoss called that "BS." Osnoss also noted that Hg Capital's offer was "a bummer" because of its "low assumption" for debt—which translated to less liquidity for General Atlantic.

110. On October 7, 2023, after bid day and before making its belated bid, Vista contacted Goldman without anyone from Evercore or the Special Committee on the line—meaning Goldman was only representing General Atlantic on this call. During this call, Goldman directly informed Vista that its bid needed to be above $22 to clear the first round. Thus, rather than penalize Vista for missing the bid deadline, Goldman provided General Atlantic's preferred bidder—Vista—with preferential treatment and provided information unavailable to other bidders, allowing Vista to make the minimum possible offer to be invited to the next round.

111. On October 9, 2023, consistent with the tip it had received from Goldman, Vista submitted a bid for an acquisition of 49% of EngageSmart common stock for between $22.00 and $23.00. The proposal indicated Vista could complete diligence within seven days after receiving requested information and expected to execute a definitive agreement within 8-10 business days.

### L. Francisco Partners "Prefers" A Majority Deal and Complains About the Lack of Diligence

112. With the bids in hand, Goldman and Evercore conducted "Bid Walkthough[s]" with the bidders. Not mentioned anywhere in the Proxy is that, during an October 9, 2023 discussion,

Francisco Partners expressly told Goldman and Evercore that it "***prefer[ed] to do a majority deal and control the business but that wasn't on offer***." The Proxy elided this by disclosing that Francisco simply stated that it had "expressed that its typical transaction would have involved a change of control," while *not* disclosing that Francisco Partners had expressly stated it had a "preference" for a majority transaction with EngageSmart. In truth, Francisco Partners' statements to Evercore and Goldman that it ***preferred*** a majority deal, but that its preference was not "on offer," indicates that its bid of $20.50 to $21.00 per share was priced based on the lack of control and that, were a majority sale a possibility, Francisco Partners would have been willing to pay a higher price for the shares of EngageSmart stock held by minority stockholders.

113. Moreover, and again completely absent from the Proxy, Francisco Partners told the advisors that it did not have all the data it needed to make an improved bid. Specifically, according to Evercore's notes from the bid walkthrough, Francisco Partners was "***[d]isappointed with the level of data sharing so far.***" Vista, meanwhile, was not plagued by the same informational disadvantage. This was because the Special Committee expressly allowed Vista to "restore" its files from the 2022 process which provided more comprehensive data. As Vista made clear in internal talking points, the 2022 process provided "quite frankly, more access to information than we received in this process." Vista was, therefore, further privileged among the potential bidders. Despite its informational disadvantage, Francisco Partners assured Evercore that "[w]ith full access they can go super fast" and "[c]an run at it in a couple of weeks." Thus, unbeknownst to shareholders, Francisco Partners, like Vista, wanted to make a majority offer and was willing to move fast to make that happen.

### M. Vista Follows Its Well-Known and Anticipated High-Pressure Acquisition Strategy

114. During its October 10, 2023 meeting, the Special Committee limited the bidder list to three potential acquirers by inviting Vista, Francisco Partners, and Hg Capital to a second round

of bidding. The Special Committee decided not to allow multiple bidders who reached out in the aftermath of the October 5, 2023 *Reuters* article to enter the process, specifically because, among other things, "General Atlantic was not willing at such time to solicit interest in a transaction other than selling a minority stake without a change of control." Again, only Vista had been informed concerning the true parameters of a potential deal.

115. The Special Committee told Vista, Francisco Partners, and Hg Capital that second round proposals were due in four weeks, but when Vista expressed the desire to move quickly on the timeline indicated in its proposal, Evercore and Goldman told Vista that they would work with them to move faster than with other bidders. Again, Vista was given an unfair advantage.

116. Vista's desire for speed was not surprising as Vista is well known for using a high-speed, high-pressure acquisition strategy.[5] "Vista leverages its ability to move quickly from an expression of interest, through confirmatory diligence, to a firm offer, thereby truncating the process and reducing interloper risk. Vista calls it 'sprinting,' and for Vista, that's good business."[6] Although speed suits Vista's needs, it often presents problems for target companies and their minority stockholders. "For a target company seeking to maximize stockholder value, however, a truncated timeline can present challenges. It takes time to develop alternatives to promote competition and extract the best price. By sprinting to the finish line, Vista seeks to prevent a target company from doing that."[7] In this case, General Atlantic, EngageSmart, and the Special Committee gave Vista an inside track and tilted the playing field in the sales process, allowing Vista to use its *modus operandi* of speed to a tee.

---

[5] *See In re Mindbody, Inc., Stockholder Litigation*, C.A. No. 2019-0442-KSJM, 2023 WL 2518149, at *14 (Del. Ch. Mar. 15, 2023) ("Vista is a pro at acquiring companies . . . Vista's advantage is speed.").

[6] *Id.*, at *1.

[7] *Id.*

117. Knowing Vista's reputation, Evercore had previously discussed on September 27, 2023 that they "need[ed] to start thinking about what we do if Vista tries the playbook they often do," and a second Evercore representative responded in agreement, acknowledging Vista "know[s] the business cold . . . so it is a good assumption that they will follow their playbook." A third Evercore representative noted, "It has been a successful playbook for them. And it's also been successful for our clients [], if we are ready to adjust fire when they try to expedite things."

118. Nonetheless, neither Evercore nor the Special Committee did anything to "adjust fire," despite anticipating Vista's attempt to jump the process. Instead, both Evercore and the Special Committee let General Atlantic and Goldman control the process without setting conditions that would allow multiple bidders to fully analyze a deal. Thus, the Special Committee told Vista that if it wanted to move fast, it was on board—playing right into Vista's playbook.

### N. Evercore Is Excluded From Communications While Vista Capitalizes On Its Inside Information and Makes A Majority Deal Proposal

119. On October 17, 2023, the Special Committee held a meeting, also attended by Semel, Evercore, and Skadden. According to the Proxy, Evercore updated the Special Committee on interactions with prospective investors interested in a potential transaction involving EngageSmart; that Vista continued to progress its due diligence at the accelerated pace reflected in its proposal; that Francisco Partners had requested a dinner meeting with senior management for the week of October 23, 2023 (to be attended by a representative of Evercore); and that Hg Capital appeared to be less engaged. Evercore discussed with members of the Special Committee the considerations around setting a final bid deadline in the range of November 9 to November 14, 2023. Evercore warned that, with an earlier deadline, the other bidders "might not have sufficient time to complete their review." Thus, a short turn-around was only helpful to Vista, who had prior access to information from 2022.

120. Email correspondence from October 18, 2023 shows that Evercore was consistently kept out of key deal discussions during this critical time. For example, Goldman had excluded Evercore "from certain folders" and had not provided Evercore access to the virtual data room. Despite prior requests, Goldman had not provided the proper access and otherwise failed to keep Evercore updated on discussions with bidders. Evercore's Graf was angry: "***We don't need to ask multiple times. Simply tell them on behalf of the special committee we needed analytics permissions. And also tell (don't ask) them to cc you on the drl emails going back and forth between gs and bidders***." Understanding that Evercore was being excluded from key deal communications that were happening at breakneck speed, Graf sent another email suggesting that Evercore "put a standing daily call on calendar w gs working team to run through diligence / meeting request updates." Another Evercore deal team member, Adi Jayaraman, similarly asked his colleague whether he had "push[ed]" Goldman's Arif Sikora "about his teams lack of responsiveness and keeping us abreast of developments."

121. Yet, even after Evercore's direct protestations, Goldman continued to prevent Evercore from having meaningful influence over the sales process. The very next day, October 19, 2023, the Special Committee's counsel at Skadden learned that Vista planned a follow up call with Goldman. Skadden explained to the Special Committee that it "told [General Atlantic's] advisors [*i.e.*, Goldman] that the Special Committee hasn't been consulted on this, and so there would need to be an Evercore participant on that call." Evercore wanted to speak with Goldman in advance of the Vista call, but Goldman ignored Evercore's request until 15 minutes prior to the call.

122. On Friday, October 20, 2023, Vista met with its internal Investment Committee and, using inside information unknown to other bidders (*i.e.*, that General Atlantic was open to a deal that would result in General Atlantic retaining only a minority position), decided it would make a

majority bid for EngageSmart. Ultimately, the Investment Committee authorized Vista to acquire 70% ownership of EngageSmart for a price up to $24 a share.

123. Later that day—well before the bid deadline provided to Francisco Partners and Hg Capital—Vista submitted its revised majority proposal. Vista's bid proposed $22.75 per share in cash, with General Atlantic rolling over a portion of its existing shares representing 40% of the post-closing equity of EngageSmart. The cash portion of the offer fell within the range Vista previously submitted of $22–$23 per share, but instead of seeking a minority position, it now was for control. Accordingly, Vista's deal offered ***no additional value for the control***.

124. Vista also indicated it had completed all due diligence and was ready to finalize definitive agreements and, if EngageSmart was not willing to proceed on Vista's "very expedited timeline," it would reevaluate its participation in the process. Indeed, Vista held a call with representatives of General Atlantic, Evercore, and Goldman and explained that Vista desired to sign and announce a transaction on Monday, October 23, 2023, the very next business day.

### O. Vista's Bid is Accepted in Just Three Days Despite the Fact That Other Bidders Were Not Given the Chance to Compete for a Majority Position

125. In immediate response to the new offer, Goldman held a meeting on October 20, 2023 with General Atlantic and Paul Weiss—but not Evercore, the Special Committee, or Skadden. Moreover, Stamas instructed his General Atlantic team to "run a version" of the internal analysis "where it shows exactly what liquidity we get and how much we own," demonstrating that General Atlantic's focus remained on its own liquidity rather than maximizing the deal valuation. This meeting is not disclosed in the Proxy.

126. Later that day, the Special Committee held a meeting, also attended by Semel, Evercore, and Skadden, where Goldman relayed that General Atlantic had provided initial feedback on the October 20 proposal and that General Atlantic was potentially willing to pursue a

transaction involving a sale of control as proposed by Vista. Part of the rationale, as explained in the Proxy, was the "level of interest" parties had in buying a minority share. The Proxy, however, did not indicate that Francisco Partners had previously expressed a preference for a majority deal but was rebuffed by Goldman.

127. Following discussion, the Special Committee directed Evercore to make a counterproposal to Vista consisting of $24.00 per share in cash and changes to Vista's proposed merger agreement to include, among other things, a 45-day go-shop provision. General Atlantic supported the counterproposal.

128. The Special Committee, however, did not go back to other bidders and shop the control deal that was now being offered. Thus, as to the majority deal then being contemplated and ultimately agreed upon, EngageSmart's sales process was effectively a single-bidder process. Though the Special Committee had gone through the motions of soliciting bids, those bids had been for a fundamentally different transaction than the majority deal proposed by Vista. Indeed, other bidders had been expressly informed that a majority deal was unavailable. When the contours of the deal changed, neither the Special Committee nor anyone else attempted to reengage with the other bidders to gauge their interest in a majority transaction—including Francisco Partners, which had expressly stated its interest in such a deal. Indeed, while discussions with Vista moved forward at breakneck speed, Goldman actively *delayed* discussions with other bidders. For example, on the same day Vista submitted the October 20 proposal and insisted upon a deadline to announce a transaction by Monday, October 23, 2023, a different bidder, Hg Capital, asked for an update on the timeline, and Goldman and Evercore responded that they would hear something by the middle of the following week—*i.e.*, after Vista's Monday deadline.

129. On the morning of October 21, 2023, Vista responded to the Special Committee's counterproposal with a revised non-binding proposal consisting of increased consideration of $23.00 per share in cash and rejecting the proposed go-shop provision.

130. Later that morning, Goldman communicated to Evercore that General Atlantic wanted to make a revised counteroffer at $23.50 per share. That afternoon, the Special Committee held a meeting, also attended by Semel, Evercore, and Skadden, and directed representatives of Evercore to convey a counterproposal consisting of $23.50 per share with a 30-day go-shop. Evercore communicated the revised proposal that day.

131. The next day, October 22, 2023, Vista declined to increase its price to $23.50 but indicated that it would accept the proposed 30-day go-shop provision. According to the Proxy, Vista communicated to Evercore and Goldman that a deal at $23.00 per share was the highest price per share that Vista was willing to pay—however, it is clear that General Atlantic and Goldman did not consider the $23 bid to be Vista's true "final" offer, as they contemplated making an additional counterproposal.

132. Ultimately, however, General Atlantic was not incentivized to seek a further price increase because it would diminish General Atlantic's liquidity. Indeed, Stamas was unsure of whether General Atlantic should counter again at $23.50 per share and asked his colleagues whether General Atlantic should take the deal or push for a price increase. General Atlantic's Osnoss and Stamas expressly discussed how the proposed increase in Merger consideration would lead to $70 million less liquidity for General Atlantic (as more rollover equity would be required to maintain the desired equity ownership level). Accordingly, Osnoss concluded that Vista had "the leverage and they know it," and "[i]t's a good price." Thus, by General Atlantic's own admission, Vista's knowledge that General Atlantic needed liquidity and that an increase in purchase price meant less cash for General Atlantic directly affected deal negotiations.

133. General Atlantic also recognized that Goldman would be in favor of this deal and would not push for another counterproposal, specifically because Goldman was not concerned with maximizing value for minority stockholders but, instead, with securing its own success fee. According to General Atlantic's Stamas, Goldman was all about "Deal deal deal deal. Money money. Totally objective 😊"—referring to Goldman's $36 million transaction fee if a deal was consummated. That Goldman's and General Atlantic's interests conflicted with other EngageSmart shareholders had a real impact on the ultimate transaction because internal Vista documents reflect that Vista was actually authorized for a deal price of up to $24 per share.

134. Bennett also did not believe that Vista's offer was "final." Bennett thought there was additional value being left on the table and indicated that he "will take the recommendation of [the Special Committee]" but thought it might make sense "to try once more on price." General Atlantic's internal discussions showed that Osnoss thought it was "dumb to fight over 25c."

135. The Special Committee met on October 22, 2023, to decide whether to accept the offer. However, according to an email from General Atlantic's General Counsel, the Special Committee was not ready to make the final decision because "they want[ed] [General Atlantic's] blessing first" and were "waiting for [General Atlantic] to say ok to price." That is, the Special Committee deferred to what General Atlantic wanted. Only after hearing that General Atlantic was in agreement as to the price per share, the Special Committee accepted the offer.

136. On October 23, 2023, EngageSmart announced the Merger in the Merger Press Release. As detailed below, the Merger Press Release was materially false and misleading concerning the events leading to the Merger. *infra* ¶¶ 144-151.

137. Upon the sudden announcement of the Merger, the other bidders reacted with shock to the fact that EngageSmart and General Atlantic had agreed to a majority deal with Vista, without ever indicating such a deal was a possibility to the other bidders. Indeed, although not disclosed

in the Proxy, Francisco Partners proactively "reached out to" Evercore and "complained" about the structure of the newly announced deal and the fact that Francisco Partners had been misled throughout the process. Francisco Partners told Evercore that it was "[d]isappointed" and "frustrated" that the "deal turned into [a] majority" because Goldman "told them multiple times there was no majority deal." Francisco Partners also noted that it had not been contacted by Goldman since the Merger was announced, implying that no one checked whether Francisco Partners would make a stronger control offer.

138. Furthermore, unbeknownst to the public, Francisco Partners raised doubts about whether EngageSmart and General Atlantic ever seriously considered "a real minority deal." Francisco Partners remarked that, had such a deal been contemplated, they "[w]ould have thought Vista not in process." This concern was well-founded, as Vista's hallmark lies in implementing sweeping operational transformations—an approach that necessitates gaining full operational control over its investments. Consequently, without even knowing that General Atlantic had tipped off Vista as to the true parameters of a potential deal at the very outset of the process, Francisco Partners recognized that Vista's involvement in the deal process strongly suggested that the minority offering to other bidders was nothing more than a façade. Ultimately, Francisco Partners expressed that it "[w]ished they were told" that a majority deal was possible, "but understood the [V]ista playbook." Similarly, Hg Capital called Goldman and "wanted to know how this ended up majority. Feels like [EngageSmart] tapped out."

**P. After the Go-Shop Fails, Defendants File a Materially Misleading Proxy Statement, and the Merger Is Approved**

139. The Merger Agreement provided for a 30-day go-shop period. If the Merger Agreement were terminated during the go-shop period, EngageSmart would be required to pay Vista a termination fee of $72.185 million (representing 1.8% of the equity value). This fee would

increase to $144.37 million (representing approximately 3.6% of equity value) if the Merger Agreement were terminated after the go-shop period ended.

140. The bidders knew the go-shop was illusory. *First,* throughout the entire process, bidders were told General Atlantic would not approve anything but the sale of a minority stake, only to accept a majority deal from Vista. As a result, bidders like Francisco Partners understood that General Atlantic only wanted a deal with Vista—its preferred bidder. *Second,* after General Atlantic made itself and EngageSmart CEO Bennett available for any due diligence questions from Vista, the go-shop precluded bidders from talking to General Atlantic or Summit until *after* making a superior proposal. *Third,* Goldman and Evercore encouraged Francisco Partners and Hg Capital to drop out of the go-shop process quickly. Indeed, Goldman and Evercore agreed that they needed to "bottom out HG and [Francisco Partners] quickly" and believed that they were successful in that effort. Evercore and Goldman called "[Francisco Partners] and HG and delivered [a] message (with skaddens guidance…[])" that sufficiently bottomed out Hg and [Francisco Partners]. Evercore reported that Francisco Partners was "Very disappointed . . . Wasted a lot of time . . . [and was] mostly likely a no." Hg stated it was "[u]nlikely they come back." Goldman acknowledged "it [is] rare that a go-shop would ultimately increase the consideration received by [a] Company's stockholders and that it [is] also rare to see another private equity bidder submit a topping bid in a transaction already involving a private equity buyer." As expected, the go-shop failed.

141. On December 19, 2023, Defendants issued the Proxy to "inform" stockholders concerning the Merger and solicit their votes in favor thereof. The votes of the Unaffiliated Stockholders were important because the Merger was conditioned on approval by the Unaffiliated Stockholders. As detailed below, however, the Proxy issued to solicit the votes of the Unaffiliated Shareholders was materially false and misleading concerning the events leading to the Merger. *infra* ¶¶ 152-178.

142. The shareholder vote occurred on January 23, 2024, and the Merger was approved. Three days later, on January 26, 2024, the Merger closed. The Unaffiliated Stockholders received $23 per share as Merger consideration and the Company's common stock was delisted.

## II. DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

143. Throughout the Class Period, Defendants issued or caused to be issued SEC filings that contained numerous false or misleading statements or omitted material facts concerning: (i) the unfair sales process that provided distinct advantages to Vista, including its exclusive knowledge concerning General Atlantic's willingness to become a minority investor following a strategic transaction; (ii) the fact that other bidders indicated a desire to make a majority bid during the sales process but were rebuffed, and later questioned whether a minority deal was ever a real possibility; (iii) General Atlantic's true motivation for liquidity and that a higher purchase price would be inconsistent with that motivation; (iv) the extent of the overall conflicts that infected essentially every aspect of the sales process; and (v) ultimately, as a result of all of the foregoing, the unfairness of the Merger to the Unaffiliated Shareholders. These disclosures contained materially false and misleading statements and omissions, thereby denying stockholders an appropriately informed vote on the Merger and an appropriately informed opportunity to decide whether to accept the Merger consideration or instead exercise their appraisal rights.

### A. False or Misleading Statements or Omissions of Material Facts in the October 2023 Merger Press Release

144. On October 23, 2023, EngageSmart and Vista issued the joint Merger Press Release, entitled *EngageSmart Agrees to Be Acquired by Vista Equity Partners for $4.0 Billion*, which EngageSmart filed with the SEC as a "Current Report" on Form 8-K signed by Defendant Hudson, which was identified as "Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12," and which was incorporated by reference into the Proxy. The Merger

Press Release stated:

> A special committee of EngageSmart's Board of Directors comprised of ***independent directors*** [] ***advised by independent legal and financial advisors***, was formed to conduct ***a deliberate and thoughtful process*** to evaluate this proposal and other potential value creation opportunities for EngageSmart.

145. This statement was false and misleading and omitted material facts. The Merger was not the result of a "deliberate and thoughtful process" because Vista was the favored bidder throughout and was privy to a different process entirely. Indeed, as early as July 2023, General Atlantic reached out to Vista—outside the Special Committee process—and communicated that General Atlantic was "looking for a way to do a deal with" Vista and that General Atlantic was "okay being a minority partner"—facts not disclosed to other bidders or investors.

146. Thus, while every other bidder was consistently told that General Atlantic was only interested in selling a minority stake without a change of control, Vista knew that General Atlantic was open to selling a majority stake in EngageSmart and used that information to its unique advantage. The Special Committee knew that other parties were interested in bidding for a controlling stake in the Company, with Francisco Partners in particular: (i) telling Goldman and Evercore in October 2023 that it ***"prefer[ed] to do a majority deal and control the business but that wasn't on offer"***; (ii) complaining after the announcement of the Merger that they "wishe[ed] they were told" that a majority deal was possible, indicating they would have made a competing bid; and (iii) even questioning whether EngageSmart and General Atlantic ever seriously considered "a real minority deal" from the start. Moreover, the process was not "thoughtful" or "deliberate" because Vista had an informational advantage throughout. The Special Committee gave Vista (and only Vista) access to the more comprehensive due diligence from the 2022 sales process. This provided Vista "quite frankly, more access to information than we received in this

[2023] process" while other bidders were "[d]isappointed with the level of data sharing." The disparate due diligence provided to bidders was never disclosed to shareholders.

147. Moreover, the Merger negotiations were dominated by Goldman. Evercore and the Special Committee knew that Goldman had boxed them out of much of the Merger negotiation process but ultimately acquiesced to Goldman and covered up these facts in the Proxy. This was highly problematic, as Goldman was simultaneously advising General Atlantic, whose interests diverged from the Unaffiliated Stockholders. Indeed, the Proxy hid that Evercore repeatedly tried to open the process to control bids to prospective buyers, but was overruled and thwarted by Goldman. Goldman also had numerous undisclosed engagements with General Atlantic, Vista, and Summit. Any notion that the sales process had been facilitated by "independent" financial advisors was simply false.

148. Additionally, the statement in the Merger Press Release that the Special Committee was comprised of "***independent directors***" was false and misleading and omitted material facts. Defendant Hamilton—one of the two members of the Special Committee—was a Managing Director of Summit, which, like General Atlantic, was motivated to monetize its investment in EngageSmart to obtain liquidity, as the Summit funds that invested in EngageSmart were past or nearing their typical 10-year life cycle in 2023. Hamilton, as a Summit Managing Director, was incentivized to achieve a transaction that allowed Summit to liquidate its EngageSmart holdings and return capital to investors, even if the transaction was not in the best interests of EngageSmart's public stockholders. General Atlantic recognized that Summit was aligned with its liquidity goals, as General Atlantic deal analysis materials included a line item for "Summit Liquidity." Additionally, Summit frequently co-invested with General Atlantic, including no less than *seven* times over the past *seven* years (including EngageSmart). In each such transaction, General Atlantic either infused substantial capital into Summit-backed companies (like EngageSmart in

2018), permitted Summit to invest alongside General Atlantic in the same transaction, or purchased Summit's stake for a substantial profit, providing Summit with needed liquidity. Hamilton was conflicted as to Vista as well, for similar reasons, given Summit's longstanding and ongoing business relationship with Vista.

149. The October 2023 Merger Press Release also represented that the Special Committee led the process of negotiations leading to the Merger and that, only after its recommendation, did the Board Defendants approved the Merger:

> Transaction ***negotiations were led by the Special Committee*** and following its unanimous recommendation, the EngageSmart Board of Directors unanimously approved the merger agreement with Vista and agreed to recommend that EngageSmart stockholders vote to adopt the merger agreement.

150. This statement was false and misleading and omitted material facts because the Special Committee did not lead the negotiations in any sense. The negotiations were led and driven by General Atlantic and Goldman for General Atlantic's benefit, and the Special Committee merely rubberstamped the Merger desired by General Atlantic and EngageSmart's conflicted Board. Indeed, Evercore—the Special Committee's advisor—was consistently denied access to critical information by Goldman and was excluded from key communications Goldman conducted with bidders for the Company.

151. The Press Release further stated that "***Goldman Sachs & Co. LLC is acting as exclusive financial advisor to EngageSmart***." This statement was false because, as even its engagement letter acknowledged, Goldman was *not* exclusively representing EngageSmart. It was also representing General Atlantic, whose interests diverged from EngageSmart and the Unaffiliated Stockholders to the point that "*Plaintiffs' litigation is almost a certainty*." Unbeknownst to stockholders, Goldman had expressly recognized that General Atlantic was "effectively buying out the public" and therefore maximizing purchase price was not in General

Atlantic's interest, as higher Merger consideration "cuts the other way." Goldman also appreciated that General Atlantic's intent to rollover equity in the transaction "Allows GA to maximize future upside and drive strategic vision" and provides "Potential for GA to monetize some stake"—benefits not relevant to other EngageSmart shareholders (and in violation of the Certificate of Incorporation's Equal Treatment Provision). Goldman, moreover, consistently used the term "we" when referring to General Atlantic, including in emails explaining that the Special Committee would not interfere with their plans as "we"—*i.e.* General Atlantic—would control every aspect of the Merger process. Despite acknowledging these direct conflicts between General Atlantic and EngageSmart, and contrary to the advice from its in-house counsel, Goldman nevertheless agreed to represent both General Atlantic and the Company. Furthermore, contrary to its obligations under the NDAs and in defiance of its in-house counsel's advice, Goldman regularly communicated with deal participants wholly outside the presence of Evercore and the Special Committee and regularly had communications about Vista's bids with just General Atlantic representatives. Such communications were only permissible if Goldman was ***only*** representing General Atlantic. Any claim that Goldman was acting as an "exclusive" advisor to the Company is therefore false.

### B. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Definitive Proxy

152. On December 19, 2023, EngageSmart issued the Proxy. In addition to statements by the EngageSmart Defendants, the Proxy acknowledged that General Atlantic and Vista each may be "deemed to be an affiliate of EngageSmart" under SEC rules, and those entities made specific representations in the Proxy.

#### 1. False and Misleading Statements or Omissions of Material Facts Concerning the Fairness of The Merger Process

153. The Proxy recommended that shareholders vote in favor of the Merger because the "Special Committee's process" was designed to "obtain the best value reasonably available." To

support that claim, the Proxy boasted that the advisors contacted "ten parties" to "solicit interest in a potential minority investment transaction" and provided each with "an opportunity to conduct due diligence." Specifically, the Proxy claimed the Special Committee's recommendation was supported by:

> ***The Special Committee's process***, together with its and EngageSmart's advisors, for soliciting and responding to offers from potential counterparties in an ***effort to obtain the best value reasonably available*** to the unaffiliated security holders including the fact that ten parties were contacted in such process ***to solicit interest in a potential minority investment transaction in EngageSmart with General Atlantic continuing as the controlling stockholder of EngageSmart***, all of which entered into non-disclosure agreements with EngageSmart and were ***provided with an opportunity to conduct due diligence***, including reviewing the estimated projections of EngageSmart's financial prospects and conducting management diligence sessions based on non-public diligence information with members of EngageSmart's management[.]

154. Similarly, the Proxy stated that the full EngageSmart Board recommended shareholder approval of the Merger because of the "***procedural fairness***." Indeed, according to the Proxy, the full Board thought the deal was "advisable, fair to, and in the best interests of EngageSmart and the Unaffiliated Stockholders" because of "***both the substantive and procedural aspects of the Merger***."

155. The statements in ¶ 153 and ¶ 154 were false and misleading. The Merger process was not designed to "obtain the best value," and did not exhibit "procedural fairness," because Vista was privy to an entirely different process than other bidders. While other bidders were told that a "minority investment transaction" was the only transaction structure on offer, Vista knew otherwise. Indeed, as early as July 2023, General Atlantic reached out to Vista—outside the Special Committee process—and communicated that General Atlantic was "looking for a way to do a deal with [Vista]" and that General Atlantic was "okay being a minority partner." Vista was therefore the only bidder who knew the true parameters of a potential deal. When other bidders, such as Francisco Partners, noted that they "prefere[d]" to make a majority bid, they were told

"multiple times" that such a deal was unavailable. The "process" was so unfair that Francisco Partners even questioned whether EngageSmart and General Atlantic ever seriously considered "a real minority deal" or whether the entire process was a charade.

156. Moreover, the "procedural aspects" of the Merger were unfair because, contrary to the Proxy's claims, not all bidders had the same "opportunity to conduct due diligence." The Proxy failed to disclose that Vista was allowed to "restore files from its prior work" in the 2022 sales process giving it "quite frankly, more access to information than we received in this process." Other bidders, on the other hand, were stuck with the sub-optimal level of diligence in the 2023 process and were accordingly "[d]isappointed with the level of data sharing" from EngageSmart and the lack of "full access" to necessary records.

157. The Proxy also misleadingly told investors that the Special Committee "actively" oversaw the sales process. According to the Proxy, the Special Committee's "***Active Involvement and Oversight***" of the sales process supported the fairness of the Merger. Specifically, the Proxy stated the Special Committee had "***active oversight of the negotiation process***" and "***was actively engaged in this process on a regular basis***." Moreover, the Proxy claimed that the full EngageSmart Board recommended the deal precisely because of the "procedural fairness of the Merger, including that … it was ***negotiated by the Special Committee***."

158. The Proxy also proclaimed that Vista and General Atlantic, *i.e.* the "Purchaser Filing Parties," considered the Merger "procedurally and substantively fair to the unaffiliated security holders of EngageSmart" specifically due to "the fact that ***consideration and negotiation of the Merger Agreement were conducted under the control and supervision of the Special Committee***," and because "the ***Special Committee had independent control of the extensive negotiations with the members of the Purchaser Filing Parties***."

159. The statements in ¶ 157 and ¶ 158 were false and misleading because the Special Committee and its representatives at Evercore did not have "active oversight of the negotiation process" and the negotiations were not conducted "under the control and supervision of the Special Committee." Indeed, as part of its plan to deliver a "fully baked" deal to the Special Committee, Goldman's "default mode" was to exclude Evercore from discussions with bidders. From the initial outreach, Goldman made sure to limit discussions to "1 person at GS + management + the bidders" such that "Evercore would not be part of those presentations." Goldman did not change its tactics even after the Special Committee mandated that the NDAs with bidders require Evercore's participation in deal discussions. Evercore was forced to complain that "the [NDA] clearly states no interaction but through advisors so how come GS in receipt of bidder questions without sharing with us." Even as late as October 18, 2023, the same week EngageSmart entered into the Merger Agreement with Vista, Evercore was still not provided access to the virtual data room or provided "analytics permissions" despite having "to ask multiple times." Furthermore, at that late and critical stage of negotiations, Evercore was still not being copied on "emails going back and forth between [Goldman] and bidders," and Goldman was not keeping Evercore "abreast of developments." This was especially problematic, because unbeknownst to stockholders, Goldman really represented General Atlantic's interests throughout the negotiations—not the Company's. Accordingly, the Special Committee did not have "independent control" over negotiations.

### 2. False and Misleading Statements or Omissions of Material Facts Concerning Alternative Bidders

160. The Proxy creates the false impression that there were no credible alternative prospective bidders. The Proxy reports, in regard to the October 5, 2023 bid, that Francisco Partners "***expressed that its typical transaction would have involved a change of control.***" The

Proxy then states that Francisco Partners ***"implied it could not find additional value above the highest per share price in its proposed valuation range***." Later, the Proxy claimed that Francisco Partners was "***moving significantly more slowly than Vista***" as a reason the Special Committee accepted the Vista offer.

161. The statements in ¶ 160 were false and misleading. Francisco Partners did not simply suggest that its "typical" transaction would have been for control but actually told Evercore and Goldman that it "***prefer[ed]…* a majority deal**," and that such a preference was not included "***on offer***." Thus, the Proxy's claim that Francisco Partners "could not find additional value" was misleading because it implied that Francisco Partners would not increase its offer even for a majority stake. In fact, the actual statement that a majority deal was not "on offer" implies the exact opposite—*i.e.*, that Francisco Partners was signaling that an increased offer was available for control. Indeed, upon learning that EngageSmart agreed to a majority deal with Vista, Francisco Partners was "disappointed" and "frustrated" that Goldman previously "told them multiple times there was no majority deal" and that it "wish[ed] they were told" that a majority deal was possible—facts not disclosed in the Proxy. Such frustration only makes sense if Francisco Partners was inclined to increase its offer for a majority stake in EngageSmart.

162. Moreover, it was misleading for the Proxy to state that Francisco Partners was moving "slowly" with due diligence as a reason to accept Vista's bid. Francisco Partners actually expressed the opposite to Evercore and Goldman when it informed them that it was prepared to go "super fast" if it were provided full access to the necessary due diligence.

163. Next, although Vista was aware since at least July 2023 that General Atlantic was "okay being a minority partner," the Proxy falsely states on numerous occasions that General Atlantic told all prospective bidders that only a minority stake was available:

On July 23, 2023… The Special Committee further discussed that ***General Atlantic had indicated that it was only willing at that time to expressly solicit interest for a potential transaction in which General Atlantic remained a controlling stockholder and was not presently willing to solicit interest in an alternative acquisition structure***.

* * *

On August 8, 2023… It was discussed that General Atlantic had ***indicated that it was not presently willing to solicit interest in a whole company transaction***, which meant that no outreach to strategic parties was proposed at such time and that General Atlantic was expected to prioritize outreach to investors that it viewed as likely to be interested in a minority investment with General Atlantic continuing as the controlling stockholder of EngageSmart.

* * *

On August 9, 2023, representatives of General Atlantic provided feedback to EngageSmart and Goldman Sachs on the contents of the outreach script and the list of prospective investors (with prioritization), which feedback reflected that ***General Atlantic was not presently willing to solicit interest in a whole company transaction*** and desired to prioritize outreach to investors that it viewed as likely to be interested in a minority investment with General Atlantic continuing as the controlling stockholder of EngageSmart.

* * *

On September 26, 2023…It was discussed that representatives of General Atlantic had communicated that General Atlantic desired at the current time ***to explore investor interest only in connection with selling a minority ownership stake in EngageSmart without a change of control and that it was not willing at the current time to expand the scope of a potential transaction to be solicited in a bid process letter***. Following discussion, the Special Committee determined that it would be in the best interests of EngageSmart's stockholders unaffiliated with General Atlantic to continue to explore investor interest in a potential transaction involving selling a minority stake in EngageSmart without a change of control including by sending the bid process letter to interested parties, and to continue to review other strategic alternatives.

* * *

On October 10, 2023… the Special Committee determined that, given the level of outreach already conducted by EngageSmart, the feedback received, the fact that ***General Atlantic was not currently willing to solicit interest in a transaction other than selling a minority stake without a change of contro***l and the risk of disruption to the current transaction process (which could put the existing bids at risk by introducing delay and additional leak potential) and distraction to management

> involved with outreach to additional parties, that EngageSmart should not invite the parties who had expressed inbound interest into the process or contact additional parties at such time.

164. These statements in the Proxy noted in ¶ 163 were false and misleading and omitted material facts because, unbeknownst to investors, and to other bidders, Vista had been informed at the very outset of the process that a change of control transaction was a possibility. Indeed, Francisco Partners even questioned whether EngageSmart and General Atlantic ever seriously considered "a real minority deal" or whether the entire process was a charade.

**3. False and Misleading Statements or Omissions of Material Facts Concerning General Atlantic's Desire for Liquidity as a Motivating Factor**

165. The Proxy Statement misleadingly describes the circumstances regarding the acceptance of Vista's October 22, 2023 offer of $23 per share. According to the Proxy, "[f]ollowing receipt of the October 22 Proposal," Evercore was informed that "***General Atlantic would be willing to proceed to finalize a transaction on the basis of the October 22 Proposal*** if Mr. Bennett was supportive of the October 22 Proposal." The Proxy then notes that Mr. Bennett "***deferred to the Special Committee on how to best proceed with the negotiations***," which ultimately agreed to accept the offer.

166. The statements in ¶ 165 were materially misleading because they omitted the material facts that: (a) General Atlantic refused to push for additional Merger consideration because a higher purchase price would impair its receipt of liquidity from the Merger; and (b) the Special Committee deferred to General Atlantic in accepting the proposal. Indeed, unbeknownst to investors, General Atlantic contemplated making an additional counteroffer to Vista at $23.50 per share but declined to do so after discussing that the suggested increase in the purchase price would result in $70 million less liquidity for General Atlantic. Moreover, the claim that the ultimate decision on whether to accept the October 22 offer was left to the Special Committee was

materially misleading, because it omits that the Special Committee "wait[ed] for" General Atlantic to provide its "blessing first" and to "say ok to price." Thus, the Special Committee did not independently contemplate and accept the offer.

167. Similarly, the Proxy states that General Atlantic determined to accept the Merger because the Merger consideration "***will provide liquidity for the unaffiliated security holders of EngageSmart without the delays that would otherwise be necessary in order to liquidate the positions of larger holders***."

168. The statement that General Atlantic approved the deal because it "will provide liquidity for the unaffiliated security holders" was materially misleading because it omitted that General Atlantic's motivation for liquidity impacted price negotiations and General Atlantic's ultimate agreement to the Merger price. In fact, General Atlantic representatives specifically discussed that seeking higher Merger consideration was harmful to General Atlantic because an increased purchase price from $23 to $23.50 per share would result in $70 million less liquidity for General Atlantic. Indeed, the Proxy does not disclose General Atlantic's liquidity motivation, let alone the impact that General Atlantic's liquidity motivation had on price negotiations.

#### 4. False and Misleading Statements or Omissions of Material Facts Concerning Goldman's Conflicts

169. The Proxy misleadingly represented Goldman as EngageSmart's financial advisor when Goldman was really representing General Atlantic's interests, not those of the Company. For example, the Proxy stated that the Special Committee "discussed that ***EngageSmart proposed to engage Goldman Sachs*** given its long-standing relationship with EngageSmart," that the Special Committee's counsel at Skadden "discussed ***EngageSmart's proposed engagement of Goldman Sachs*** (which, as previously discussed with the Special Committee, had a long-standing relationship with EngageSmart and knowledge of its businesses)," and that "***Goldman Sachs***

***would be a financial advisor to EngageSmart*** (and not the Special Committee)."

170. The statements in ¶ 169 describing Goldman's role were materially misleading because they give the false impression that Goldman was representing the Company's interests as a neutral financial advisor. As described above, Goldman was representing General Atlantic's interests throughout the process.

171. In discussing Goldman's potential conflicts in the proposed transaction, the Proxy stated that "Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by Goldman Sachs Investment Banking to Vista and/or its affiliates and portfolio companies, and to General Atlantic and/or its affiliates and portfolio companies of approximately $87.4 million and approximately $45 million, respectively." The Proxy further stated that Goldman "***may also in the future*** provide financial advisory and/or underwriting services to EngageSmart, Vista, General Atlantic and their respective affiliates and, as applicable portfolio companies," and "***also may*** have co-invested with Vista, General Atlantic and their respective affiliates."

172. The statements in ¶ 171 were misleading because they failed to disclose the true extent of Goldman's ties to General Atlantic beyond the advisory fees. In fact, the firm: (i) issued a $150 million term loan to General Atlantic, lent General Atlantic another €300 million to repay a different loan in 2021, and held a $50 million revolver loan to a General Atlantic fund due September 2025; (ii) concurrently was advising and marketing at least three separate General Atlantic funds; (iii) concurrently was advising General Atlantic portfolio company Capital Foods in assessing strategic alternatives; (iv) concurrently was advising General Atlantic in its take-private of HireRight; and (v) maintained co-investments with General Atlantic in at least six different companies, including at least one made in the middle of the EngageSmart sales process.

173. The statements also misleadingly omit material information about Goldman's

conflicts vis-à-vis Vista. The Proxy failed to disclose that the same Goldman bankers purportedly advising EngageSmart (including at least one banker working on the Merger) were also concurrently advising Vista on another transaction for Vista portfolio companies Allvue and Alegeus. The Proxy also omits that Goldman: (i) provided an unsecured $1.5 billion loan to Vista's portfolio companies in July 2023; (ii) assisted Vista with a $1 billion investment in Finastra in September 2023; and (iii) provided a $50 million revolver loan to Vista due March 2027.

174. Given the deeply intertwined relationships between Goldman, Vista, and General Atlantic, the statements suggesting that Goldman "may also in the future" and "may also have co-invested" with General Atlantic and Vista in the past were materially misleading. They failed to reveal the intricate and ongoing connections Goldman maintained with both entities, thereby hiding the true extent and significance of Goldman's conflicts of interest.

175. The statements regarding Goldman's conflicts of interest were also misleading for entirely omitting Goldman's fees earned from Summit, including approximately $25 million in the prior two years.

### 5. False and Misleading Statements or Omissions of Material Facts Concerning the Special Committee's Independence

176. The Proxy falsely claims that the Special Committee was "independent." The Proxy states that Hamilton "confirmed that ***Summit would not have interests in a potential transaction that differed materially from those of the public stockholders***," noting only that "Summit and General Atlantic had invested in the same portfolio companies ***only in a limited number of cases*** (and that Mr. Hamilton had participated in one or more of such cases)." Accordingly, the Proxy declared time and again the that the Special Committee was "comprised ***solely of independent and disinterested directors***," that its "members were ***independent of General Atlantic*** and disinterested with respect to a potential transaction involving General

Atlantic," and that the Special Committee members were "***not otherwise interested with respect to a potential transaction involving EngageSmart***."

177. The statements in ¶ 176 were false and misleading and omitted material facts because Hamilton was conflicted. Hamilton was a Managing Director of Summit which, like General Atlantic, was singularly interested in monetizing its investment in EngageSmart to obtain liquidity, as the Summit funds that invested in EngageSmart were past or nearing their typical 10-year life cycle in 2023. Summit, and therefore Hamilton, was incentivized to achieve a transaction that allowed Summit to liquidate its EngageSmart holdings and return capital to investors, even if the Merger left additional funds on the table or was not in the best interests of EngageSmart's public stockholders. In fact, General Atlantic recognized that Summit was aligned with its liquidity goals, as General Atlantic deal materials included a line item for "Summit Liquidity."

178. Further, while the Proxy vaguely points out that Summit and General Atlantic had investments in the "same portfolio companies," it fails to explain that Summit and General Atlantic transacted or coinvested directly with each other *seven* times over the past *seven* years (including in EngageSmart), and that in each transaction, General Atlantic either infused substantial capital into Summit-backed companies (like EngageSmart in 2018), permitted Summit to invest alongside General Atlantic in the same transaction, or purchased Summit's stake for a substantial profit, providing Summit with needed liquidity. Thus, Summit wanted to maintain its lucrative relationship with General Atlantic, and therefore Hamilton was willing to bow to General Atlantic's wishes—and give Vista preferred bidder status—throughout the process. Indeed, the Special Committee expressly sought General Atlantic's "blessing" and for it "to say ok to price" before accepting the Vista offer. The Proxy also fails to disclose that Hamilton was conflicted as to Vista as well, for similar reasons, given Summit's longstanding and ongoing business relationship with Vista.

### C. False or Misleading Statements or Omissions of Material Facts in the December 19, 2023 Schedule 13E-3 by EngageSmart, General Atlantic, and Vista

179. On December 19, 2023, EngageSmart, General Atlantic, and Vista jointly issued a Schedule 13E-3 for the Merger, signed by Defendant Hudson on behalf of EngageSmart as well as Vista's Vice President, Jeffery Wilson, Vista's Managing Member, Robert Smith, and General Atlantic's Managing Director, Michael Gosk. The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its ***entirety***." Thus, the Schedule 13E-3 included the same false and misleading statements described in Sections II.A and II.B, *supra*, which were materially false and misleading for the same reasons.

## III. ADDITIONAL ALLEGATIONS OF SCIENTER

180. For purposes of Count II below, as alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the Merger process were materially false and misleading when made. In addition to the allegations set forth above, these particularized facts include the following.

### A. General Atlantic Was Motivated to Keep the Merger Price Low

181. The Merger was structured to allow General Atlantic to roll over 26% of its (pre-merger) equity into a 35% stake in the post-close company. Thus, General Atlantic stood on both sides of the transaction and was motivated to keep the Merger price low, a notion expressly recognized in Goldman's internal communications. Recognizing this problematic structure, Goldman understood that "*Plaintiffs' litigation is almost a certainty*" and therefore instructed deal participants that "[a]ll the books and documents that get made become public" and stressed the

need to consider "[w]hat should be talked about / written down." The structure of the deal combined with efforts to restrict discoverable documents are highly indicative of scienter.

### B. General Atlantic and Summit's Needs for Liquidity Knowingly Impacted Deal Negotiations and Provided a Motive to Accept a Suboptimal Deal While Keeping Unaffiliated Stockholders in the Dark

182. Numerous facts confirm that General Atlantic and Summit needed liquidity and were willing to sacrifice on the purchase price of EngageSmart shares to accomplish that goal. Indeed, despite hearing from Goldman in May 2022 that EngageSmart shares were projected to be trading between $29.71 to $41.16 in the coming two years and in October 2022, that General Atlantic could monetize 38% of its holdings and still maintain 49% ownership of the Company, General Atlantic sold millions of shares in the Secondary offering in March 2023 at a price of just $19.00 per share to generate cash. Then, at the start of the 2023 process, Goldman recognized that the "Potential for GA to monetize some stake" was a key rationale for a deal and that General Atlantic's dual objectives of retaining ownership and seeking liquidity were at odds with each other in terms of whether a high price was advantageous to General Atlantic.

183. Other internal documents confirm that a desire for liquidity was a motivating rationale for the deal. In July 2023, Osnoss texted a General Atlantic colleague that an "ESMT exit" was one of the firm's 2023 objectives and General Atlantic's internal analysis calculated both General Atlantic's and Summit's liquidity levels generated by potential transactions. And General Atlantic's Portfolio Committee materials stated that General Atlantic expected "to receive liquidity at close to totaling ~$1,022M, via both the incremental debt raised at the company and our sell down of equity shares." Accordingly, the bid letters to prospective bidders instructed that offers should indicate the liquidity to General Atlantic generated by the proposal, both portraying General Atlantic's motive and signaling to potential bidders that they should structure their bids to maximize the benefit to General Atlantic, not necessarily to EngageSmart's stockholders at large.

184. Moreover, once the bids came in, Osnoss commented that the Francisco Partner's deal was "BS" for not providing General Atlantic any liquidity and that Hg Capital's bid was a "bummer" for the limited liquidity it offered. When Vista made its initial majority bid on October 20, 2023, Stamas instructed his team to "run a version where it shows exactly what liquidity we get and how much we own." Then, instead of seeking a price increase when Vista reiterated its $23 per share price, Stamas and Osnoss discussed that a $0.50 per share price increase would result in $70 million less in liquidity for General Atlantic. After Vista made its majority offer, proposing that General Atlantic roll over equity representing 40% of the post-closing, General Atlantic doubled down and asked to retain only 35% post-closing ownership, supplying even more liquidity. Indeed, following the transaction, General Atlantic's CEO commented that it was "A real boost to performance and ***liquidity- just what we needed!!***"

185. Liquidity was a major concern for General Atlantic for a host of reasons. *First*, as Vista itself learned, General Atlantic's limited partners were itching for a return on their EngageSmart investment. Indeed, Vista's internal notes from the July 31, 2023 call with General Atlantic noted that Vista had "heard from some LPs [limited partners]" that "GA is looking for DPI (distributed to paid in-capital)." *Second*, as *Bloomberg* reported in articles dated July 7, 2022 and September 26, 2023, General Atlantic was "weigh[ing] an initial public offering" and had been "mulling an IPO in recent years." These were more than just rumors. On December 11, 2023—during the Class Period—*Reuters* reported that General Atlantic had "confidentially filed for a U.S. initial public offering." If General Atlantic were to go public, it needed to show returns in order to boost the value of its shares. *Third*, on October 11, 2023—in the heart of the 2023 process—*The Financial Times* reported that General Atlantic, as well as other private equity firms, utilized margin loans against their investments to boost returns to investors. This practice caused "some investors [to] worry they tilted returns too far towards financial engineering, rather than

companies' underlying performance" and could "make it harder for investors to understand the percentage of return that come from fund finance versus the actual investment return." In fact, General Atlantic had already taken a margin loan against its EngageSmart holdings, which at the time of the Merger had $52 million outstanding. Accordingly, General Atlantic needed large amounts of liquidity to show investors that its underlying strategy was working and therefore needed the Merger to be approved via the Proxy.

### C. General Atlantic's Rollover of Equity, Which Violated EngageSmart's Certificate of Incorporation, Was Extremely Valuable

186. EngageSmart's Certificate of Incorporation included an Equal Treatment Clause stating that "each share of Common Stock shall have the same powers, rights and privileges and shall rank equally, share ratably and be identical in all respects as to all matters." The Merger, which allowed General Atlantic to liquidate a large portion of its Company holdings and roll over 35% of its holdings into the newly private Company, violated the Equal Treatment Clause because other EngageSmart stockholders were not treated identically. General Atlantic and its advisor Goldman knew or should have known about this provision, as they were both heavily involved in the Company's IPO.

187. The Merger's structure, which allowed General Atlantic to roll over a portion of its holdings, was highly lucrative to General Atlantic. Vista had projected "base case" cash returns of between 3.2x and 3.8x on its EngageSmart investment, with internal rates of return of 22-23%. Similarly, General Atlantic's base case projected that its equity rollover "will generate ~19% incremental IRRs from here, resulting in an incremental $1.3Bn net gain[.]" Defendants violated the Equal Treatment Clause by prioritizing General Atlantic's need for liquidity at the expense of minority shareholders. General Atlantic's knowing violation of the Equal Treatment Clause

demonstrates that they had full knowledge that they were not treating minority stockholders fairly in connection with the Merger.

### D. General Atlantic, EngageSmart, and the Special Committee Knew the Special Committee Did Not Control the Sales Process or Negotiations

188. From the very beginning of the process, Goldman expressly tried to sideline Evercore and the Special Committee in deal negotiations and communications. The Special Committee recognized as much and even required the NDAs to include a provision mandating that Evercore be involved with all deal communications. Nonetheless, Evercore was forced on numerous occasions to complain to Goldman that the Special Committee was being circumvented in substantive deal negotiations, even during the key time period around October 18, 2023—when the bidders were preparing their final bids. In fact, Skadden needed to alert the Special Committee to a significant meeting between General Atlantic and Vista scheduled for October 19, 2023, *i.e.* the day before Vista's majority bid. Throughout the entirety of the process, General Atlantic and EngageSmart both showed disdain for the Special Committee's involvement as both Stamas and CFO Hudson complained about the bureaucracy of the Special Committee, with Hudson "just doing what I need to at this point" and not keeping them actively involved.

### E. The Special Committee Knew the Process was Unfair Because it Allowed Vista to Restore its Prior Files, Which Provided More Comprehensive Data Than the 2023 Process

189. The Special Committee expressly allowed Vista to "restore" its files from the 2022 process, which provided more fulsome data than that provided to the bidders competing in the 2023 process. As Vista made clear in internal talking points, the 2022 process provided "quite frankly, more access to information than we received in this process." Vista's competitors in the 2023 process complained of being "[d]isappointed with the level of data sharing" from EngageSmart and of the lack of "full access" to necessary records.

**F. The Special Committee and General Atlantic Ignored Evercore's Advice to Test the Market for Majority Interest**

190. Evercore wanted to let potential bidders know that General Atlantic was open to considering a sale of its majority position in the Company. Thus, Evercore suggested edits to the script that would have informed investors that General Atlantic was "open to all value-creating alternatives" such as a "sale of the WholeCo." This suggestion was rejected by General Atlantic.

**G. Francisco Partners Was Disappointed They Were Never Informed That a Majority Deal Was on the Table**

191. Upon learning that EngageSmart agreed to a majority deal with Vista, Francisco Partners, a sophisticated and repeat participant in corporate sales processes, recognized the impropriety of what had occurred. It voiced that it was "disappointed" and "frustrated" that Goldman previously "told them multiple times there was no majority deal" and that it "wish[ed] they were told" that a majority deal was possible. Francisco Partners even questioned whether the minority deal was ever really a legitimate possibility. The reaction of Francisco Partners is further evidence that Vista was favored by the Defendants throughout the process and indicative of scienter.

**H. CEO Bennett Was Motivated to Sell the Company to Vista Because a Majority Deal Qualified as a Change in Control, Entitling Bennett and Other Executives to Lucrative Payments**

192. Defendant Bennett, who was actively looking to retire, was motivated to pursue a merger that would trigger the change of control provisions of his employment agreement, providing him with lucrative compensation. Defendant Hudson had similar provisions in her employment agreement, motivating her to support a change in control transaction like the one uniquely offered by Vista. Bennett knew that Vista wanted control of the company based on his involvement in the 2022 process with Vista, and he proactively reached out to Vista at a time when the Special Committee had not approved Vista as an outreach candidate. Bennett's employment

agreement (along with Hudson's) provided that if the executive is terminated by EngageSmart without "cause" or by the executive for "good reason," within a certain number of months (three months for Bennett and two months for Hudson) prior to or within the 12-month period following a change of control, the applicable executive officer will be entitled to the following severance benefits, payable in cash, less applicable withholdings:

- A lump sum amount equal to a certain number of months (18 months for Bennett and 12 months for Hudson) of base salary;
- A certain number of months (18 months for Bennett and 12 months for Hudson) of continued health insurance coverage;
- The applicable executive's *pro rata* target bonus, payable in a lump sum; and
- 100% acceleration of all time-based equity awards.

The table below summarizes the total value of those payments for these Defendants:

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Robert Bennett | 1,264,356 | 9,485,434 | 48,000 | 10,797,790 |
| Kevin O'Brien | 714,489 | 2,819,363 | 30,000 | 3,563,852 |
| Scott Semel | 451,553 | 2,595,642 | 22,500 | 3,069,695 |
| Cassandra Hudson | 933,086 | 6,434,109 | 30,000 | 7,397,195 |

In addition, Bennett, and Hudson were eligible for acceleration in full of their EngageSmart restricted stock unit ("RSU") Awards if the executive is terminated by EngageSmart without "cause" or by the executive for "good reason" within a certain number of months prior to or within 12 months of a change in control. In final negotiations with Vista, Bennett pushed for a full cash-out of the equity awards. Similarly, Bennett and Hudson's EngageSmart option awards would vest in full in connection with the change in control. The table below summarizes the values of those benefits:

| Name | EngageSmart RSU Awards ($)[1] | EngageSmart Option Awards ($)[2] |
|---|---|---|
| Robert Bennett | 6,236,059 | 3,249,375 |
| Kevin O'Brien | 2,819,363 | — |
| Scott Semel | 2,595,642 | — |
| Cassandra Hudson | 2,770,281 | 3,663,828 |

193. Defendant Hudson showed her knowledge that the Special Committee was not running the process and that its activities were a charade when she sent an email to Goldman's Sikora admitting that the Special Committee meetings were "so stupid[.] I really hope my next sale process doesn't involve a special committee."

194. Defendant Stamas was aware that General Atlantic's need for liquidity would be facilitated by a less-than-vigorous sales process. In 2022, Stamas told Goldman that General Atlantic wanted "an abbreviated public process" and was merely "worried about the optics." Stamas also knew about Bennett's meeting with Goldman and Vista on September 5, 2023 (which excluded Evercore and the Special Committee).

195. Stamas and Osnoss demonstrated their knowledge that Goldman was not impartial nor objective when they parodied Goldman's attitude, which Stamas characterized as "deal deal deal deal. Money money. Totally objective 😊."

196. Hamilton expressed during the 2022 process that he only wanted an advisor that could benefit Summit in later transactions, betraying his own conflict in this regard. Hamilton quickly sought to help Summit benefit from Evercore's retention by the Special Committee, writing to a Summit colleague who was "chasing" a deal where Evercore was advising the seller that Hamilton had delivered "$25M to EVR for a short sprint" and "I hope you use that to win your deal."

197. In their roles as directors and officers of the Company during the sales process and Class Period, the Special Committee Defendants, Board Defendants, and Officer Defendants

directly participated in the management of EngageSmart's operations and, because of their positions at EngageSmart, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, possessed the power and authority to control the contents of EngageSmart's press releases and Proxy in connection with the Merger.

198. The foregoing facts, particularly when considered holistically and in the light most favorable to the Plaintiffs (as they must be), support a strong inference of Defendants' scienter.

## IV. LOSS CAUSATION

199. As described herein, Defendants made or caused to be made materially false and misleading statements and omissions of material facts in the Proxy. These materially false and misleading statements and omissions as set forth above caused Plaintiffs and other members of the Class to vote in favor of the Merger and/or accept Merger consideration that failed to adequately value EngageSmart common stock. As a result, Plaintiffs and other Class Members suffered damages under Section 14(a) of the Exchange Act.

200. The false and misleading statements alleged herein deflated the market price members of the Class received for their EngageSmart shares in the Merger and in open-market sales, by concealing facts indicating that the shares were more valuable than the Merger price, and that a higher price could be obtained.

201. As described above, EngageSmart was far more valuable than the Merger price. *First,* preceding the announcement of the Merger, Vista's Investment Committee authorized Vista to pay up to $24 per share for EngageSmart. *Second*, Vista could have paid even more than $24 per share and still meet its target returns. *Third,* Vista significantly accelerated the Company's planned timeline to block out any other bidders. *Fourth*, unbeknownst to investors, other bidders, such as Francisco Partners, indicated that their bids would have included a control premium and would

have been higher had they known a majority transaction was possible. *Finally*, Vista was able to parlay its knowledge of the true contours of the sale parameters, the limited bidders, and General Atlantic's desire for immediate liquidity to minimize the price paid to Unaffiliated Stockholders. General Atlantic was not motivated to press for the maximum Vista would pay because a higher per share price could result in less liquidity to General Atlantic.

202. During the Class Period, Defendants also made materially false and misleading statements and omissions and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Plaintiffs and the Class, and induced Plaintiffs and the Class to sell EngageSmart shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger Consideration. In addition, had Plaintiffs and members of the Class not been induced to sell at deflated prices, they could have secured fair value of their shares through appraisal. Plaintiffs and the Class suffered economic harm as a result of their sales of EngageSmart common stock during the Class Period, *i.e.*, damages under Section 10(b) of the Exchange Act.

203. Had the truth been known to the market, EngageSmart shares would have traded at higher prices throughout the Class Period. Members of the Class who sold their shares during the Class Period would therefore have obtained a higher price for their shares.

204. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and would have obtained a higher price per share. Alternatively, stockholders would have voted down the Merger, and no transaction would have been effectuated, such that members of the Class who retained their shares would not have been deprived of the fair value of their shares in a forced sale.

205. Based on Defendants' misrepresentations, EngageSmart's stock price became tethered to the underpriced Merger Consideration, as indicated in the following chart:




206. As the market price was artificially depressed, members of the Class who sold their shares during the Class Period obtained a lower value for their shares.

207. Members of the Class who held EngageSmart shares on the Record Date were deprived of the information necessary to exercise a fully informed vote, as well as a fully informed decision whether to dissent and seek appraisal for the fair value of their EngageSmart shares, and other available relief. Had the truth been known to the market, Defendants would have been unable to obtain approval for the Merger at the agreed price and Plaintiffs would have obtained a higher price per share. Alternatively, stockholders would have voted down the Merger and no transaction would have been effectuated.

## V. INAPPLICABILITY OF STATUTORY SAFE HARBOR

208. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint. The

statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by a director or officer of the Company who knew that the statement was false when made.

## VI. CLASS ACTION ALLEGATIONS

209. Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of Unaffiliated Stockholders entitled to vote on the Merger and the Class consisting of sellers of EngageSmart common stock from October 23, 2023 through the close of the Merger on January 26, 2024, including those stockholders who sold shares in the Merger. Excluded from the Class are the Defendants and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

210. This action is properly maintainable as a class action.

211. The Class is so numerous that joinder of all members is impracticable. According to the Proxy, there were 168,334,721 shares of EngageSmart common stock outstanding as of December 7, 2023. Upon information and belief, there are hundreds or thousands of members of the Class.

212. There are questions of law and fact that are common to the Class, including, among others:

(a) Whether Defendants violated Section 14(a) of the Exchange Act and/or Rule 14a-9 promulgated thereunder;

(b) Whether Defendants violated Section 10(b) of the Exchange Act and/or Rule 10b-5 promulgated thereunder;

(c) Whether the Special Committee Defendants, Board Defendants, Officer Defendants and General Atlantic violated Section 20(a) of the Exchange Act;

(d) Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether Defendants knew, recklessly and/or negligently disregarded that their statements and/or omissions were false and misleading;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class Members and the appropriate measure of damages.

213. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class have been damaged by Defendants' wrongful conduct.

214. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class. All members of the Class have suffered the same harm.

215. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class. Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

216. The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## VII. PRESUMPTION OF RELIANCE

217. Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose information regarding EngageSmart's business and sales process, among other things, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions of material facts set forth above, that requirement is satisfied here.

218. In the alternative, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions of material facts pursuant to the fraud-on-the market doctrine because, at all relevant times, the market for EngageSmart securities was open, efficient and well developed for the following reasons, among others:

(a) EngageSmart was listed and actively traded on the NYSE, a highly efficient market;

(b) As a regulated issuer, EngageSmart filed periodic public reports with the SEC and/or the NYSE;

(c) The price of EngageSmart common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

(d) EngageSmart regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(e) EngageSmart was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

219. Because the market for EngageSmart was efficient, it is assumed that: (1) any misrepresentations were incorporated into the market price; (2) Plaintiffs and Class members relied on that market price when deciding when to buy or sell, and; therefore, (3) Plaintiffs and Class members indirectly relied on any misrepresentations when deciding to sell EngageSmart common stock, including the decision to tender shares into the Merger, rather than seeking appraisal.

220. The stock price strongly reacted to the announcement of the Merger and Merger related news. Furthermore, during the period after the announcement of the Merger, it is clear that the stock price was influenced by the Merger price. These facts strongly support a presumption of market efficiency because they show the market reacted efficiently to information, and the Merger is obviously important information that would be reflected in the stock price.

221. In addition, while a merger is pending, a vital right affecting share ownership is the right to seek appraisal. Market participants often buy or sell the stock based on their valuation of an appraisal claim. Trading based on the value of the right to seek appraisal affects the overall market price of the stock. Indeed, if information is disclosed that causes investors to perceive an appraisal claim as more valuable, investors interested in seeking appraisal will consequently value the shares at a higher level, placing upward pressure on the stock price. If information is disclosed showing that appraisal would be less valuable, the share price could experience downward pressure. Other investors who are not interested in seeking appraisal may adjust their own valuation of the shares based on their perception of what other investors are willing to pay due to the possibility of appraisal. Accordingly, the possibility of appraisal ties information relating to the Company to the value of its shares even in instances where a merger is likely to close.

222. The relationship between the right to appraisal and the market price for a company's shares was explained in a University of Washington Law Review Article:

> In a developed appraisal market, appraisal arbitrageurs will seek to accumulate a position in the target company following the announcement of a transaction, and will continue to purchase shares until the market price has been driven to the risk-adjusted expected present value of an appraisal claim. . . . Minority shareholders would thus share in the expected gains from appraisal without having to file a petition themselves, just as the benefits from the market for corporate control accrue to ordinary shareholders. Indeed, minority shareholders could be better off by sharing in these gains than if they had sought appraisal themselves because professional arbitrageurs, as sophisticated repeat players, may be able to reduce overall costs in pressing claims or achieve better results in appraisal than individual investors could on their own.

*See* Charles R. Korsmo, Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U.L. Rev. 1551 (2015).

223. Aside from appraisal, investors rely on Company-specific information during the pendency of a merger. Often referred to as "merger arbitrage," investors often buy shares below a proposed merger price and either sell those shares in the merger or at a higher value as new information pertaining to the merger emerges. These investors may often make a purchase based on the prospect of a higher offer arising before the merger closes or based on the "fallback" value of the company should the merger fail, both of which are based on and tied to information about company fundamentals. Accordingly, information relating to the company would be relevant to the valuation of the security and the price at which the security trades while a merger is pending.

224. During the Class Period, many sophisticated investors specializing in investing during the pendency of a merger made investments in EngageSmart, thereby enhancing the market efficiency of EngageSmart.

**COUNT I**
**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

225. Plaintiffs repeat and re-allege the allegation set forth in Paragraphs 1 through 224 as if fully set forth herein.

226. Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

227. The Proxy was prepared, reviewed, and/or disseminated by Defendants. Each of the Defendants authorized the dissemination of the Proxy and the use of their names in the Proxy, and were involved in the sales process leading up to the closing of the Merger. By virtue of their positions within EngageSmart and/or access to Company and Merger information, these Defendants were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.

228. Defendants were negligent in issuing a false and misleading Proxy. Count I is not based on any knowing or reckless misconduct on the part of the Defendants. Count I does not depend on, and the relevant facts do not allege, wrongdoing that sounds in fraud. Count I is premised on the fact that there were material misrepresentations and omissions in the Proxy, and the Defendants were negligent in failing to recognize this fact.

229. Plaintiffs, while reserving all rights, expressly disclaim and disavow at this time any allegation that could be construed as alleging that this claim sounds in fraud against Defendants in connection with this Count. This claim sounds in negligence and is based on Defendants' failure to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

230. The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to EngageSmart shareholders.

231. In addition, EngageSmart, General Atlantic, and Vista jointly issued a Schedule 13E-3 for the Merger. The filing was identified as "solicitation materials or an information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its ***entirety***."

232. The Proxy was an essential link in causing EngageSmart shareholders to approve the Merger and to forego their appraisal rights.

233. By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

234. Because of the false and misleading statements in the Proxy, Plaintiffs and the Class were harmed by an uninformed shareholder vote approving the Merger.

235. This claim is brought within the applicable statute of limitations.

**COUNT II**
**Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

236. Plaintiffs repeat and re-allege all allegations contained in Paragraphs 1 to 224 as if fully set forth herein.

237. During the Class Period, Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiffs and other Class Members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to sell EngageSmart securities at artificially deflated prices.

238. Defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for EngageSmart securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

239. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to disseminate the misleading statements and concealed material information about the Company, its operations and prospects, as well as material information concerning the Merger and the sales process.

240. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

241. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to falsely misrepresent EngageSmart's true financial condition and material information regarding the Merger and the sales process from the investing public and to support the artificially low prices of the Company's securities.

242. 242. In addition, EngageSmart, General Atlantic, and Vista jointly issued a Schedule 13E-3 for the Merger. The filing was identified as "solicitation materials or an

information statement subject to Regulation 14A" and expressly attached and incorporated the Proxy Statement, stating: "the Proxy Statement is attached hereto" and "the information in the Proxy Statement, including all annexes thereto is expressly incorporated by reference herein in its ***entirety***."

243. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

244. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

245. This claim is brought within the applicable statute of limitations.

## COUNT III

**Against the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic for Violations of Section 20(a) of the Exchange Act**

246. Plaintiffs repeat and re-allege all allegations contained above as if fully set forth herein.

247. Defendants disseminated false and misleading statements and a false and misleading Proxy in violation of Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, promulgated thereunder.

248. The Special Committee Defendants, Board Defendants, and Officer Defendants, and General Atlantic approved the content of and authorized the publication of EngageSmart's October 2023 Merger Press Release.

249. Defendant Hudson signed EngageSmart's October 23, 2023 Form 8-K attaching the Merger Press Release and the December 19, 2023 13E-3.

250. The Special Committee Defendants and the other Board Defendants approved the contents, and ordered the dissemination, of the Proxy, which was identified in the cover letter as issued "By Order of the Board of Directors."

251. Defendant General Atlantic had the ability to control, and did control, EngageSmart at all relevant times through its majority equity stake and voting power and by appointing a majority of its directors, including Defendants McKenzie, Mangum, Osnoss, Bennett, and Stamas. In addition to controlling the composition of the Board, General Atlantic was entitled to exercise control over significant transactions. Specifically, under the Stockholder Agreement, EngageSmart was precluded from any "Major Actions"—including a merger—without General Atlantic's express written consent. Further, General Atlantic controlled the sales process by appointing its own conflicted banker, Goldman, ostensibly to advise EngageSmart, and participated in concealing this and other facts through the Board Members it appointed and controlled. General Atlantic refused to allow the Special Committee to solicit offers for anything other than a minority investment in EngageSmart that would cash out public stockholders, provide significant liquidity to General Atlantic, and keep General Atlantic in control. Defendant General Atlantic's Managing Director, Michael Gosk, signed the December 19, 2023 13E-3, which incorporated the Proxy.

252. These Defendants acted as a controlling persons of EngageSmart and culpably participated in the Exchange Act violations within the meaning of Section 20(a) of the Exchange Act as alleged herein. In particular, each of the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic had direct and supervisory involvement in the day-to-day operations of EngageSmart, and, therefore, had the power to control or influence the particular transaction giving rise to the Exchange Act violations alleged herein, and exercised the same. These Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.

The statements and the Proxy purport to describe the various issues and information that these Defendants reviewed and considered before recommending the Merger to the Class.

253. These Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. The Proxy also expressly stated that it was issued "By Order of the Board of Directors," and was signed by Defendant Stamas as Chairman of the Board of Directors.

254. The Special Committee Defendants, Board Defendants, Officer Defendants and General Atlantic had the ability to exercise control over and did control a person(s) who has violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the conduct, Plaintiffs and the Class were harmed by selling their shares at deflated prices and by an uninformed shareholder vote approving the Merger.

255. By virtue of the foregoing, the Special Committee Defendants, Board Defendants, Officer Defendants, and General Atlantic have violated Section 20(a) of the Exchange Act.

256. This claim is brought within the applicable statute of limitations.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Determining that all Defendants violated Section 14(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

C. Determining that Defendants violated Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder;

D. Determining that the Special Committee Defendants, Board Defendants, Officer Defendants and General Atlantic violated Section 20(a) of the Exchange Act;

E. Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

F. Awarding restitution and equitable relief to Plaintiffs and the Class;

G. Directing Defendants to account to Plaintiffs and the Class for all damages suffered as a result of their wrongdoing;

H. Awarding Plaintiffs pre- and post-judgment interest and the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

I. Granting such other and further relief as this Court may deem just and proper.

## IX. JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: April 15, 2025

Respectfully submitted,

**FARNAN LLP**

By: /s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0336
Facsimile: (302) 777-0301
Emails: bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

***Liaison Counsel for Lead Plaintiffs***

Andrew J. Entwistle (*pro hac vice forthcoming*)
Callie Crispin (*pro hac vice forthcoming*)
**ENTWISTLE & CAPPUCCI LLP**
500 West 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7278
Email: aentwistle@entwistle-law.com
ccrispin@entwistle-law.com

Vincent R. Cappucci (*pro hac vice forthcoming*)
Brendan J. Brodeur (*pro hac vice forthcoming*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Email: vcappucci@entwistle-law.com
bbrodeur@entwistle-law.com

David J. Schwartz (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
10 Bank Street, Ste. 882
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
Email: dschwartz@saxenawhite.com

Thomas Curry (Bar No. 5877)
**SAXENA WHITE P.A.**
824 N. Market St., Suite 1003
Wilmington, DE 19801
Telephone: (302) 485-0483
Facsimile: (888) 424-8566
Email: tcurry@saxenawhite.com

Adam Warden (*pro hac vice forthcoming*)
Jonathan Lamet (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
Email: awarden@saxenawhite.com
jlamet@saxenawhite.com
***Co-Lead Counsel for Lead Plaintiffs***